THE GALILEO.

THE EDGAR BAXTER.

(*District Court, S. D. New York.* June 22, 1885.)

1. COLLISION—SIGNALS—DELAY IN OBSERVING—STEAMER IN FAULT.
    A vessel's delay in maneuvering in accordance with her own signals is at her own risk.

2. SAME—CASE STATED—MISCALCULATION BY PILOT.
    The steamer G., coming in from sea, stopped off quarantine, and got headed somewhat down and across the channel. Afterwards, when she was backing and filling, in order to turn around, the tug E. B., with the bark H. & T., under sail in tow, on a hawser of 60 fathoms, was seen coming down the channel, their course lying somewhat astern of the steamer. When about 400 yards apart, the steamer, which was then heading S. E., with her engines backing, gave a signal of one whistle, to which the tug replied with one. The steamer at once stopped her engines, but did not at once order them full speed ahead. The tug observing that the steamer was moving astern, when about 150 or 200 yards off, blew several cautionary blasts, to which the steamer again replied with one whistle. The tug and bark ported. The steamer's engines were then ordered full speed ahead, but not in time to prevent her backing enough to come between the tug and bark and striking the hawser. The hawser was cast off; the bark starboarded and struck the steamer a glancing blow abreast of the bridge. *Held,* that the steamer was solely in fault for delay in ordering her engines "full speed ahead" in accordance with her own signal; and that miscalculation by her pilot was the cause of the collision.

3. SAME—RULE 21—RISK OF COLLISION, WHEN ARISES—SLOWING IMMATERIAL.
    A vessel is not required, under rule 21, to slacken speed, or stop and back, until the situation involves some apparent risk of collision. No such risk was, in this case, to be reasonably apprehended when the tug's course lay astern of the steamer, and the latter's signal indicated that she would move ahead to the eastward, and the tug had a right to rely on the steamer's doing so until it was

too late for the bark to avoid collision. The burden of proof is on the tug that fails to slow, to prove it immaterial. *Held* so proved in this case.

4. SAME—DUTY OF VESSEL.

A vessel is not bound to use more than ordinary nautical skill and judgment in avoiding the consequences of another vessel's fault.

In Admiralty.

*Owen & Gray,* for the Edgar Baxter.

*Hill, Wing & Shoudy* and *H. Putnam,* for the Heinrich and Tonio.

*Foster & Thomson,* for the Galileo.

BROWN, J.   The above cross-libels were filed by the owners of the German bark Heinrich and Tonio, and the steam-ship Galileo, to recover their respective damages, arising from a collision near quarantine, off Staten island, about 10 o'clock A. M., on April 5, 1885.   The Galileo, which is about 350 feet long and of 2,900 tons burden, had come in from sea, and had been visited by the health officer at quarantine, and was about to proceed on her way up the bay.   The tide was flood.   While waiting she had got headed across, and somewhat down, the channel, and had begun moving her engines back and forth so as to turn about and head up the bay on her proper course.   At about this time the bark Heinrich and Tonio was proceeding out to sea, in tow of the tug Edgar Baxter, on a hawser about 60 fathoms long.   The wind was from the westward, and the bark had all her lower sails set.   She was coming down about the center of the channel, perhaps a little to the westward, and heading on her proper course about S. by E.   Each was observed by the other a half a mile or upwards distant.   When about 400 yards apart the steamer, which was in charge of a Sandy Hook pilot, gave to the tug a signal of one whistle   At that time her engines were moving slow astern to stop her previous forward motion, and were probably carrying her slowly astern towards the Staten island shore.   The tug immediately replied with one whistle, and ported her wheel.   The pilot of the steamer did not hear the reply, but saw the puff of steam from the steam-whistle, and understood it as assenting answer.   The bark, which was also in charge of a Sandy Hook pilot, likewise ported and followed the tug, veering one or two points to the westward.   Observing that the steamer was moving astern, the pilot of the tug shortly after gave several blasts of his steam-whistle, which were answered by the steamer with another signal of one whistle.   The steamer continued to move astern until the tug had passed her, when she struck the tug's hawser, and came between the bark and the tug.   The hawser was thereupon cast off from the bark, and her helm was put hard a-starboard, under which her bows swung from one to three points to port, until she came into collision with the steamer, striking her a glancing blow on the port side, and injuring both vessels, for which the owners of the bark claim $7,000, and the owners of the steamer $2,000.

As to the facts of the case, there are less contradictions than usually arise in cases of this character.   The chief differences relate to

the position of the steamer; whether she was lying directly across the channel,—that is, nearly east and west,—or whether she was heading much more to the southward, as several of her witnesses state. On this point my judgment is that the weight of evidence shows that about the time of the collision the steamer was not heading more to the southward than south-east, and probably somewhat less than that.

Repeated consideration of the testimony and of all the circumstances, which are somewhat peculiar, has satisfied me that the steamer must be held solely to blame for this collision. She was not in the situation of a steamer visibly at rest; she had control of her own movements. She was under some embarrassment, it is true, in not having sufficient width of channel-way to turn around in, without backing and filling. The channel, however, was altogether nearly a mile and a half broad, and the steamer had over half a mile of unobstructed space to the eastward of her, in which she could maneuver by going forward and back, as might be necessary. She was in charge of a pilot who was familiar with the bay; she had the choice of her own maneuvers, and exercised her choice, giving a signal which meant that she would go to starboard. Neither the tug nor the bark did anything to thwart her moving to starboard, in accordance with this signal. On the contrary, they both did what under the inspector's rules was proper for them to do, if not strictly obligatory, namely, they ported and moved to the westward as far as the presence of other vessels coming up would admit. As the steamer, according to her own testimony, was moving astern under a slow engine, at the time she gave her first signal, she had the tug upon her own starboard hand, having reference to her own line of motion; and, in that respect, would be bound to keep out of the way of the tug under statutory rule 19. But, without regard to this circumstance, considering the fact that the pilot of the tug understood the circumstances of the steamer,—that she had been stopped at quarantine, and was endeavoring to turn around so as to go up the bay,—it would have been a manifest and gross error of the tug, after the steamer's signal of one whistle, to have starboarded her wheel and attempted to go to port. That would apparently have tended directly to embarrass and thwart the steamer's movement out of the way to starboard, despite her signal that she was herself going to the eastward.

The evidence satisfies me clearly that the real cause of the collision was miscalculation on the part of the pilot of the steamer, either as to the amount of stern-way that she had acquired, or as regards the time it would take her engines, when put full speed ahead, to overcome her stern-way. The pilot states that as soon as he gave his first whistle the engines then backing were ordered to be stopped, and that they were put full speed ahead almost immediately afterwards: that is, as soon as he could walk some 20 feet to the place of the indicator and give the order. Several of the steamer's witnesses also say that the steamer's stern-way was stopped at the time of the collision,

and that she had not moved astern more than half a length after her first signal. Numerous other witnesses estimate that she went astern at least two or three lengths. Other evidence shows that the steamer's testimony on this point cannot be accepted as accurate. The engineer and the pilot do not agree that the order "full speed ahead" was given at once after the order to stop backing. The engineer says that under the previous order of half speed astern, the engines had been going astern some two or three minutes, as near as he can remember; that it was about the same length of time between the order to stop and the order to go full speed ahead; that under the last order the engines had been going ahead a very short time—about a minute and a half; and that they had been stopped again some 10 or 20 seconds at the time of the collision.

It is not probable that these estimates of time are accurate, but the proportions of the different intervals may be nearly correct. They indicate that the order "full speed ahead" was not given at once after the order to stop backing. And the quarter-master, to some extent, confirms the engineer, and the above conclusions. As the tug and bark were making about six knots, the time between the first signal and the collision was probably about two minutes only. But there can be no doubt that the steamer did make considerable stern-way between her first signal and the collision; for the weight of evidence is clearly to the effect that when the first signals were exchanged, and when the tug was some 400 yards away, the steamer was from one to two points on the tug's port bow, and, though the tug and bark both ported, the steamer ran back astern so far as to come between the tug and bark before the collision. It is not at all probable that this would have happened had the steamer, when the first signal was given, been going almost "imperceptibly astern," as the answer alleges; nor would it have happened if the engines had been put full speed ahead for nearly the whole interval of two minutes. Besides this, the answer alleges that "the Galileo's first whistle was given when the tug was about 300 yards away; and, when the tug was *about 150 yards away*, the latter blew several short, sharp whistles, and was seen by those on board the Galileo to fall off about a point to starboard; *thereupon the engines of the Galileo were put ahead*, her helm being still hard a-port." From this allegation, which, in the diversity of evidence, must be held of great weight, agreeing, as it does, with the other probabilities of the case, it must be held that the steamer delayed considerably in putting her engines full speed ahead, and that this order was not given until the tug had covered half the distance that was between them when the first signals were given. The steamer's delay in acting upon her own signal was plainly at her own risk. There is no excuse for the steamer's not checking her stern-way at once. There was no necessity for her to continue to go astern after her signal was given that she would go to starboard. No explanation is offered for the delay. The pilot denies that there was

any delay. But the proof is to the contrary, and I cannot imagine any other cause of this delay than misjudgment by the pilot as to the time required to get headway on the steamer. So far as I can see, the collision must be ascribed solely to his want of promptness in going ahead, and to his negligence in not reversing his engines at once, so as to proceed ahead to starboard in accordance with his own signal. This was the direct cause of the collision, and for this the steamer is answerable.

2. The arguments of the able counsel for the steamer have not satisfied me that any fault can be justly ascribed to the tug or to the bark. The weight of evidence is that their course, as they came down the bay, lay a little to the westward of the steamer, and that they had the latter when a quarter or a half a mile off one or two points on their port hand. Though they understood that the steamer had been stopping at quarantine, and was turning around to come up the bay, there was no reason to suppose that the steamer, having the whole easterly half of the channel unobstructed, over a half mile in width, would back so far to the westward as to cross the line of the tug's course, and thus interfere with them. The signal of one whistle given by the steamer was, under the circumstances, a positive agreement that she would not do so, but would go ahead to the eastward. The tug immediately replied with an assenting signal, and ported, as did the bark also; and that, so far, was their whole duty. Had the steamer gone ahead at once, as she in effect promised, no collision would have occurred. When, after this, the steamer was seen to be still going astern, several blasts by the tug were given as cautionary signals. The reply of one whistle again given by the steamer was a renewed assurance that she would go to the eastward, and was equivalent to saying that she could take care of herself.

Under the circumstances it is clear that there was no misunderstanding by the two pilots in regard to the course or the intention of the other, so as to make rule 3 of the inspector's rules applicable. The pilot of the tug could not tell, and could not judge with any certainty, how long the steamer could safely back, or how quickly she could, on reversal, stop her stern-way and get headway. He had a right to rely upon her repeated signals, and upon her reversing in time to stop before reaching the line of his course. He went as far to the westward as the presence of the Cyclops and her tow would permit. The only remaining thing that he could have done was to slow. But it is clear that he had no reason at first to slow, because his course at that time lay astern of the steamer, and there was no reason to suppose that the steamer would not go ahead in accordance with her own signal. When this signal was given there was, in my judgment, plenty of time and opportunity for the steamer to have proceeded ahead, entirely out of the way, in accordance with her signal. In that situation, with the steamer bearing to the eastward, and with the signal from her that she would move off to the eastward, and the

tug's course at that time lying astern of the steamer, there was not at that time, apparently, any risk of collision, and the twenty-first rule, requiring the tug to slow, was not applicable. *The Free State,* 91 U. S. 200. Afterwards, when the tug gave several blasts of her whistles, as a cautionary signal to the steamer, because she was seen to be still moving astern, when the tug was, probably, not more than 500 or 600 feet distant, and the bark some 350 feet farther off, there must be deemed to have arisen a case contemplated by the twenty-first rule of the statute, section 4233. There was then risk of collision from the nearer approach of the two steamers, and the fact that the steamer's stern-way was not yet checked. Rule 21 made it the duty of the tug in this case to slacken her speed, or, if necessary, stop and reverse. In not observing this rule, but in keeping on at full speed instead, the burden of proof is upon the tug, in order to clear herself from fault, to satisfy the court beyond reasonable doubt that at the time when this risk of collision was first apparent, slackening speed or stopping would have made no difference.

I think the circumstances afford a complete justification of the tug in this instance, and that she has sustained the burden of proof that is upon her in this respect. Having the bark upon a hawser, she could not control her movements as she could have done if the bark had been lashed alongside. The bark had all her lower sails set; the breeze was fresh from the westward, and the tug's power contributed probably less than the bark's sails to her forward motion. The tug could not safely back and let her hawser drift loose in the tide; she would thereby have lost all control over the bark; and if backing had been necessary she would have been obliged to cast off the hawser at once. The two vessels could not properly proceed together unless the hawser was kept taut. No slackening of speed or stopping and backing by the tug, as the result shows, would have been sufficient to enable the bark to go astern of the steamer. Nothing that the bark could do, short of casting off considerably earlier than was done, and going to the eastward under a starboard wheel, and under sail alone, would have avoided this collision. Could the tug or the bark have foreseen that the steamer would be so tardy in checking her stern-way, this might doubtless have been done. But that course would have been directly opposite to the express indications of the steamer's repeated signals, and obviously at the risk of those who attempted it. Neither the bark nor the tug could foresee or anticipate such delay in the steamer's checking her stern-way. So long as avoidance of the collision by any effort of the tug or the bark was possible, there was not a moment when they had not a right to expect that the steamer's signal would be effectually observed on her own part. To hold the bark or the tug responsible for not having cast off the hawser, and for not proceeding to the eastward under sail alone, contrary to the indications of the steamer's whistles, would be imposing upon them a most uncommon and unreasonable requirement, in the uncer-

tainties of the situation as it actually existed, and as it appeared at the time.    When a vessel is clearly chargeable with the primary fault leading to a collision, she cannot make the other vessel answerable as for contributory negligence merely because the latter could not foresee the extent to which such fault would be continued; or because she did not take extraordinary means to avoid its consequences.    The tug was bound only to the use of ordinary nautical skill; and she had a right to rely upon the steamer's observing her own signals.    *The City of Hartford*, 11 Blatchf. 72.

In this case I think the tug and bark were not deficient in either ordinary skill or judgment, and that the steamer alone was in fault. In the first case the libelant is entitled to judgment, with costs against the Galileo; as against the Edgar Baxter the libel is dismissed; and in the second the libel is dismissed, with costs.