## THE MARTELLO.

## THE FREDA A. WILLEY.

## WILLEY v. THE MARTELLO.

## WILSON et al. v. THE FREDA A. WILLEY.[1]

*(Circuit Court, S. D. New York. July 31, 1889.)*

1. **COLLISION—IMMODERATE SPEED—STEAMER.**
   For a steamer whose full speed is 12 knots an hour, and which is near the entrance to New York harbor, in a thick fog, a speed of $5\frac{1}{2}$ to 6 knots per hour is not the "moderate speed" required by article 22 of the new international rules.

2. **SAME—SAILING VESSEL.**
   Where a sailing vessel has a speed of 10 knots an hour, loaded, and requires 4 knots an hour for steerage-way sufficient to give her master thorough control of her to tack, wear, and handle her as occasion might require, a speed of 4 knots an hour near the entrance of New York harbor, in a thick fog, is not faulty navigation putting her in fault for a collision with a steamer, the vessels being on crossing courses.

3. **SAME—CHANGE OF COURSE.**
   In the absence of any indication of the steamer's maneuvers, the master of the sailing vessel would not have been justified in violating rule 22 by a change of course.

In Admiralty. Appeal from district court. 34 Fed. Rep. 71.

(1) The Martello is a British steam-ship of 2,439 tons net register, 370 feet in length, 43 feet beam, and 28 feet in depth, owned by the respondents and appellants, Charles Henry Wilson and Arthur Wilson, and is

---

[1] Reversing 34 Fed. Rep. 71.

one of the Wilson Line of steamers plying between New York and Hull, and other foreign ports.

(2) The Martello left her dock in Jersey City on Saturday afternoon, May 7, 1887, laden with a miscellaneous cargo of merchandise, bound for Hull, England. The weather was so foggy that she could not go down the channel, but anchored for the night in Gravesend bay.

(3) The Martello got under way from Gravesend bay about 6 A. M., Sunday, May 8, 1887, and started for sea in command of Capt. Francis E. Jenkins, the senior captain in the New York service of the line, and in charge of Pilot Joseph Henderson. The weather was thick, but sufficiently clear to enable the buoys marking the channel to be seen. She proceeded down the Swash channel, and thence through Gedney's channel to the sea.

(4) When about half a mile to the westward of the perch and ball buoy, i. e., about north from the black buoy No. 1, her engine was stopped for the purpose of slowing the vessel until the pilot could be discharged. That being done, the engines were at 7:10 A. M. moved ahead slow.

(5) At about 40 minutes after discharging the pilot the horn (one blast) of a sailing vessel was heard on the starboard bow. At that time the captain and third officer were on the bridge, a competent lookout was in the crow's nest, (about 100 feet abaft the stem,) the first officer was on the lookout on the forecastle, and the quartermaster was at the wheel.

(6) At that time the steamer was heading E. S. E., the wind was about E. by N., blowing a five to six knot breeze. The fog had grown denser, and vessels could not be seen over a quarter of a mile away. The whistle of the steamer had been blown regularly at intervals of thirty seconds or less, and her speed was about five and one-half to six knots an hour. Three knots an hour would give her good steerage-way.

(7) About a minute or two after hearing the horn the officers of the Martello saw the barkentine Freda A. Willey looming in sight through the fog.

(8) On April 24, 1887, the barkentine Freda A. Willey left Pensacola bound through Long Island sound for New Haven, with a cargo of yellow pine lumber, and on Sunday, May 8th, about 8 o'clock A. M., she was bound into the harbor of New York.

(9) The Willey, with all her sails set, can make ten knots an hour. With the wind as found in the sixth finding, the Willey, if going at less than four knots an hour, would not have steerage-way sufficient to give her master thorough control of her to tack, wear, or handle her as occasion might require.

(10) About 4 A. M. of May 8th she was sailing with her mainsail, spanker, main stay-sail, upper and lower foretop sails, foretop-gallant sail, and three jibs. At 5 A. M. the wind freshened, and she took in her royal. At 7 A. M., the wind freshening, her foresail was hauled up.

(11) There was on the deck of the Willey before the collision, Cobb, able seaman, on the lookout; Mathlin, able seaman, at the wheel; Ludvigsen, second mate, and Willey, captain, about the deck; the rest of the

crew were below.  She was heading north, close-hauled on the starboard tack, sounding her horn at intervals of one to two minutes, and making about four knots an hour.

(12) While thus proceeding, she thrice heard the steam-whistle of a steamer, answering promptly each time with a single blast of her horn. At this last signal the Martello appeared in sight, bearing about four points on the port bow, and a quarter of a mile away.

(13) As soon as the Willey loomed in sight of those on the Martello, as indicated in the seventh finding, the first officer of the Martello called out "Hard a-port," and the lookout reported a vessel on the starboard bow. The captain immediately ordered the helm hard a-port, and the engines reversed full speed.

(14) The speed of the Martello under a hard a-port helm, and with engines reversed at full speed, became gradually reduced, and at the time of the collision was about two knots an hour.

(15) The place of collision was about 1¾ miles about N. by E. from Sandy Hook light-ship.

(16) As the vessels neared each other, the first officer of the Martello called out to the barkentine, "Luff! Luff all you can!" but his call was not heard by those on the Willey.

(17) From the time of the hearing of the first whistle down to the time of the collision, the steamer, except as stated in the sixteenth finding, gave no signal or indication showing whether her intention was to go ahead of the barkentine or astern, or even whether she had reversed her engines.  In consequence the Willey held her course, as she was bound to do, but the steamer ran into her with great violence, the steamer's stem running into the port bow of the barkentine, cutting its way into her keel, knocking her stem over to starboard, and driving her bow around to the eastward.

(18) Had the steamer been going at three knots an hour, had she stopped her engines as soon as she heard the Willey's horn, and reversed when she sighted the barkentine, she would have stopped short of the Willey's course.

(19) The master of the barkentine was on deck.  He had his vessel under control.  If when the steamer first sighted the barkentine the master of the latter had been advised that the steamer was starboarding her wheel, he could have ported, and avoided the collision.  If at that time the steamer had ported her wheel, the barkentine, keeping her course, would have crossed the steamer's bows in safety.  If at that time the master of the barkentine had been advised that the steamer was reversing, he could have ported, and avoided the collision.

### CONCLUSIONS OF LAW.

(1) The Freda A. Willey was free from fault.

(2) The Martello was in fault for proceeding at an excessive rate of speed in a fog, and is solely responsible for the collision.

(3) There should be a decree for the Freda A. Willey and against the Martello in each case, with costs of the district and circuit courts.

*James Thomson*, for the Martello, cited:

*The Zadok*, L. R. 9 Prob. Div. 114; *The State of Alabama*, 17 Fed. Rep. 847; *The Europa*, 14 Jur. 630; *The Vim*, 12 Fed. Rep. 906; *The Maria Martin*, 12 Wall. 31; *The Louisiana*, 2 Pet. Adm. 271; *The Continental*, 14 Wall. 345; *The C. C. Vanderbilt*, Abb. Adm. 361.

*Wm. W. Goodrich*, for the Willey, cited:

*The Hammonia*, 11 Blatchf. 414; *McCabe* v. *Steam-Ship Co.*, 31 Fed. Rep. 238; *The Nacoochee*, 28 Fed. Rep. 462; *The Colorado*, 91 U. S. 692; *The Pottsville*, 12 Fed. Rep. 633; *The Pennsylvania*, 19 Wall. 133; *The Luray*, 24 Fed. Rep. 751; *The Rhode Island*, 17 Fed. Rep. 554; *The John Hopkins*, 13 Fed. Rep. 185; *The Leland*, 19 Fed. Rep. 771; *The Elysia*, 4 Asp. 540; *The Victoria*, 3 W. Rob. 49; *The Pepperell*, Swab. 12; *The Westphalia*, 4 Ben. 404; *The Pennland*, 23 Fed. Rep. 551; *The Northern Indiana*, 3 Blatchf. 99.

LACOMBE, J., (*after stating the findings as above.*) This is an appeal from a decree of the district court, apportioning the damages resulting from a collision in a fog between the steamer Martello and the barkentine Freda A. Willey, on May 8, 1887. The colliding vessels were on crossing courses, and came together nearly at right angles, the steamer's stem striking the barkentine between her stem and the cat-head. Both vessels were damaged, and cross-libels were filed. The location of the collision is fixed by the district judge at one and three-fourth miles N. by E. from Sandy Hook light-ship. Probably it lies somewhat further to the eastward. The soundings recorded in the Willey's log seem to indicate that her course was—as her captain testifies—about a mile to the eastward of the light-ship. It is not, however, necessary to determine this location with precision, and the conclusion of the learned district judge on that point may be accepted here. The respective speed of the colliding vessels is the material and controlling fact in the case. Examination of the record has led to the opinion that the conclusion reached by the district judge, viz., that the steamer was moving at the rate of five and one-half to six knots, and the barkentine at the rate of four knots, an hour, is correct. It will not be profitable to enter upon a consideration of the evidence in detail, in view of his careful and exhaustive discussion of the various items of proof which—notably in the case of the steamer—led him to that conclusion in the face of the direct testimony of her officers. Suffice it to say that the Martello's witnesses substantially agree in giving her a uniform speed from about the time the pilot left down to the time she reversed upon sighting the Willey. That being so, the most persuasive argument as to her rate of speed is found in a comparison of the time which elapsed with the distance traversed between those periods. If the time is taken as given in the Martello's log, and the distance as found by the district judge, she must be given a speed of between five and one-half to six knots an hour; and, if the collision occurred further to the eastward, her speed would be even greater. At any rate, it is plain that a reversal of her engines full speed, ordered as soon as the Willey came in sight, (7.50 A. M.,) failed to overcome the forward impetus resulting from her prior rate of speed, and this failure was not promoted or assisted by any improper change of the Wil-

ley's course. As the Martello would have had good steerage-way at three knots an hour, her speed therefore was not moderate under the decisions, and for the resulting collision she must be held to blame.

The district judge has found the Willey in fault (1) for going at too high a rate of speed, and (2) for failing to check speed after the steamer's whistle was heard. An effort to check speed by executing the maneuver described in the case cited (*The Zadok*, L. R. 9 Prob. Div. 117) would have brought about a change of course, and she was bound to keep her course under the twenty-second rule, at least until the existing situation afforded reasonable assurance that a change would prevent a collision, otherwise imminent, and would not itself tend to produce the very mishap it was intended to avoid. But the existing situation was such that the master of the Willey could not prudently change her course in time to be of any service. The district judge so held, and rightly, upon the proof. The sole question as to the Willey, then, is this: Was her speed of four knots an hour immoderate, under the existing conditions of fog, wind, and situation? None of the cases cited in the opinion or on the argument have gone to that extent. In those where the sailing vessel was going four knots an hour she was not charged with fault; in the cases where she was held in fault her speed was five knots or over. The facts in proof do not show that her speed was too great to admit of the execution of such maneuvers as the situation in which she found herself might require. Her captain was on deck, with his vessel under command. Had the steamer advised him by signal (under nineteenth rule) or otherwise that she was directing her course to starboard, he could have kept his course. Had she advised him she was directing her course to port, or that she was reversing, he could have ported his wheel, and avoided a collision. For any such indication of the steamer's maneuvers the Willey's master was on the watch, ready to promptly respond, and at a speed of four knots an hour a prompt response would have prevented the accident. In the absence of any such indication, however, he would not have been justified in violating the twenty-second rule by a change of course. Nor did the Willey's speed prevent the Martello from avoiding the collision, because, had the latter been going at a lower rate of speed, had she stopped her engines when she heard the Willey's horn, and reversed (as she did) when she sighted the barkentine, she would have stopped short of the Willey's track, whether the barkentine was going fast or slow. Except to the extent that, if going slower, the Willey would at 7.50 A. M. have been further down the coast than the place of collision, her rate of speed cannot be said to have contributed to the collision, and should not be charged against her as faulty navigation. The district court held that the Willey "had by no means brought her speed down to the standard of good steerage-way. On the contrary, she was going at nearly full speed." In support of this proposition there was no direct testimony below, and the uncontradicted proof in this court shows that with all her sails set she is a good, 10-knot vessel, loaded, or 12, light, in a nice set of ballast; and that at less than 4 knots she would not have steerage-way sufficient to give her

master thorough control of her to tack, wear, and handle her as occasion might require. There should be a decree for the Willey and against the Martello in each case.