### THE NORTH STAR.

*(District Court, E. D. Michigan. January 25, 1890.)*

COLLISION BETWEEN STEAM-SHIPS—FOG.

When two steamers are approaching each other in a fog, and repeated signals from each of them indicate that they are drawing together upon opposite or crossing courses, it is the duty of each to stop until they come to a clear understanding with regard to their respective positions and courses, and, if there be any confusion of signals, or any other apparent risk of collision, it is their duty not only to stop but to reverse their engines.

*(Syllabus by the Court.)*

In Admiralty.

This was a suit for a collision between the steam-ships Sheffield and North Star, which occurred about 5 o'clock in the afternoon of June 14,

1889, during a dense fog, to the northward and westward of Whitefish point, in Lake Superior, resulting in the sinking and total loss of the Sheffield. The libel of the Sheffield averred that, while upon a trip from Chicago to Two Harbors, Minnesota, and after passing Whitefish point, and being put upon a W. N. W. course, she encountered a fog, which gradually became denser and steadier. While upon this course, with a smooth sea and a light wind, and with her fog-signals regularly blowing, she heard the distant sound of a steamer's whistle, nearly ahead. Her engines were at once checked, when the signal was heard again a little upon her starboard bow. She was again checked, and a signal of two blasts blown, to which no answer was received. The signal was repeated, and the Sheffield starboarded half a point. The approaching steamer, which proved to be the North Star, replied with one blast still a long distance away. To make certain whether this was blown as a fog-signal or a passing signal, the Sheffield blew a signal of two blasts two or three times, to each of which the Star answered with a signal of one blast. Thereupon the Sheffield, acquiescing in the demand of the Star to pass port to port, blew one blast and ported. The vessels were then from one and a half to two miles apart, the Star bearing less than a point upon the Sheffield's starboard bow. The Sheffield was steadied under her port wheel N. W. by N. This threw the Star upon the port bow of the Sheffield. The steamers approached, exchanging signals of one blast, until the Star was apparently well off upon the port side of the Sheffield, and all risk of collision seemed to be past. While in this situation, a signal of two blasts was heard from the Star, apparently four points off the Sheffield's bow, the vessels being now too close to change sides by starboarding. The Sheffield answered with one blast, and ported hard. Again the Star blew two blasts, which were answered again by one, and the Star appeared through the fog heading for the Sheffield, two lengths or more distant, on the port side, and coming at great speed. The master of the Sheffield at once signaled to the engine for full speed, and ordered the wheel amid-ships, but too late to be of service. The North Star struck the Sheffield at about right angles, and near her port mizzen rigging, cutting into her six or eight feet and sinking her within five minutes.

The answer averred that the North Star, being on a voyage from West Superior, Wis., to Buffalo, N. Y., upon a course S. E. by E. half E., and running under check, heard a signal of two blasts of a steam-whistle about three-quarters of a point over her starboard bow. Knowing this to be a passing signal of a steamer bound up the lake, it was promptly answered by two blasts from the North Star. In less than a minute afterwards, a second signal of two blasts was heard, still upon the starboard bow, which was again answered by a similar signal from the Star. This was again repeated. After the last signal was given and answered, the approaching steamer, which proved to be the Sheffield, suddenly blew a signal of one blast, still off the Star's starboard bow. As soon as this was blown, danger of collision was apprehended, and the Star promptly answered this signal by adhering to her own signal of two blasts, and

her speed was still further checked down. Again the Sheffield blew a signal of one blast, still upon the starboard bow, but closer. The engine of the Star was then immediately stopped, and, while this order was being obeyed, the Sheffield hove in sight near to, and heading across the bow of the North Star from starboard to port. Notwithstanding that a collision seemed inevitable, the master of the Star immediately ordered her wheel to port, so that she might swing under the stern of the Sheffield, and possibly pass her, and ordered the engine to back, and immediately followed this order by an order to back strong, in response to which every available pound of steam was given the engine. The steamer was backing with full power. Notwithstanding these precautions, the collision occurred practically as stated in the libel.

The case was argued before the district judge, assisted by Capts. Joseph Nicholson and James W. Millen, nautical assessors.

*H. H. Swan & H. D. Goulder*, for the libelant.

*C. E. Kremer* and *Robert Rae*, for the claimants.

BROWN, J., (*orally*.) . We are entirely agreed in our opinion of this case, and feel so clear as to its proper disposition that we have not deemed it necessary to confer at any length, or to prepare a written opinion. Indeed, speaking for myself, I can say that I was prepared to decide the case upon the pleadings; but, out of deference to counsel and the probability of appeal, I deemed it my duty to listen to the testimony, and, although without any doubts in my own mind, to obtain the advice of the gentlemen who have kindly consented to sit with me. I may say that in a practice of nearly 30 years in collision suits, I can hardly recall a case where the negligence seemed so gross and inexcusable, and none where the consequences were so disastrous. Indeed, judging from the frequent collisions which take place in thick weather, the hardest lesson which the masters of steam-vessels can learn seems to be the proper method of passing each other in a fog. As was remarked by Mr. Justice BUTT, in one of the last cases reported, (*The Resolution*, 6 Asp. 363,) decided only a year ago:

"Masters can always carry out the maneuvers in that way, (that is, by stopping:) and I will not yield to what I know is the strong disinclination of the masters of these large vessels to stop their engines. They hate and abhor the very idea, but it is to my mind their duty to do so, if they cannot otherwise reduce their speed sufficiently."

As illustrating the duty of masters under such circumstances, we will take *The John McIntyre*, 51 Law T. (N. S.) 185, 9 Prob. Div. 135, one of the earlier cases upon that subject, in which the master of the rolls said:

"If a steamer in a thick fog, so thick she can hardly see before her, hears another vessel in her neighborhood on either bow, not being able to see her, and she herself not going at her slowest pace, the question is whether, under those circumstances, the officer in charge of the steamer ought not to conclude that it is necessary, in order to avoid risk of collision, that he should stop and reverse. I do not hesitate to lay down the rule, not strictly as a matter of law, but as a matter of conduct, that the moment such circumstances as these happen, it is necessary, under the article, to stop and reverse."

Probably the rule here announced, that it is the duty of the steamer not only to stop, but to reverse, is somewhat too stringent, and later cases have tended in some degree to qualify it.    In the subsequent case of *The Dordogne*, 51 Law T. (N. S.) 650, 10 Prob. Div. 9, the same judge lays down the rule in the following language:

"Therefore, if a ship at sea in such a fog hears a whistle which would indicate that another vessel is a mile or a mile and a half off, she ought at once to reduce her speed to a more moderate speed, though moderate speed under these circumstances would be very different to moderate speed when the vessels came closer together.    This case is not to be determined by what was done at the time the first whistle was heard.    Here we have three, and perhaps more, successive whistles, all coming closer.    What can be the conclusion to be derived from those whistles?    We know that in fact these vessels were coming closer and closer to each other.    We, however, have to judge of what ought to be the conclusion or suspicion of the officer in charge of the Dordogne.    What would that succession of whistles tell him?    For myself, I should have had no doubt, when you have a succession of whistles, each one coming closer, that each whistle would show him that the other vessel is coming nearer.    * * *    I do not think it signifies whether the signals get broader on the bow or not, if they show that the vessel is coming closer.    If it is coming nearer and nearer in a dense fog, (and every one knows that in a dense fog you cannot tell where exactly a vessel is from the sound of her whistle,) and you cannot tell the direction in which it is coming, are not those such circumstances as should lead a prudent officer to suppose that if he went on as he was there would be danger?    * * *    That which is moderate speed when the vessels are two or three miles apart, is not moderate speed when the vessels are within half a mile of each other.    As the vessels get nearer and nearer, he must bring his ship to as complete a standstill as possible, without putting himself out of command.    If his vessel is a steamer, he must go at least dead slow. If the other is coming anything like near to him, he ought to obey article eighteen, and stop and reverse."

And here Mr. Justice COTTON adds:

"We have not to consider what was the conduct of the Dordogne when the first whistle was heard.    It is clear that there was a succession of whistles; that the vessels were coming nearer and nearer, and were, in fact, getting very near one another.    Now it was the duty of the Dordogne to stop and reverse her engine if there was risk of collision.    But it is said that, inasmuch as these whistles were getting broader and broader on the bow, the officer of the Dordogne might reasonably conclude there was no danger.    However, that will not, in my opinion, excuse the Dordogne for disobedience to article 18.    In a fog in which a man can see nothing, he cannot form any safe opinion as to the direction of another vessel, and he should, in such circumstances, follow the course stated by the master of the rolls."

But without quoting further from the language of the opinions, it is sufficient to say that the same rules have been since applied by the English courts in *The Ebor*, 11 Prob. Div. 25; *The Resolution*, 6 Asp. 363; and *The Ceto*, L. R. 14 App. Cas. 670.    The American courts have also practically affirmed and reaffirmed this rule.    I had occasion myself to do so in the case of *The Alberta*, 23 Fed. Rep. 807, where I held that the Osborne, which was proceeding at the rate of about five miles an hour, ought to have stopped when she heard the Alberta's whistles, which indicated that she was approaching and crossing her bow, or at least drawing nearer to her.

In that case both were held in fault; the Alberta for excessive speed, and the Osborne for not stopping when she heard the whistles approaching. That there is no relaxation of the rule demanding extraordinary care in cases of vessels approaching each other in a fog is evident from the remarks of Judge Brown of the southern district of New York in the case of *The Lepanto*, 21 Fed. Rep. 651. It is not necessary, however, to read further authorities upon this subject. The question is considered, and with practically the same results, in the cases of *The Britannic*, 39 Fed. Rep. 395; *The Wyanoke*, 40 Fed. Rep. 702; and *The Iberia*, 1d. 893. The courts are all agreed as to the necessity for strict caution in these cases; and so critical have they been of the conduct of masters of steamers in fogs of this kind, that it is very rare that their action has met with the full approval of the courts,—so rare, that in the case of *The Alberta*, in this court, *The City of Atlanta*, 26 Fed. Rep. 456, *The Britannic*, and *The Wyanoke*, in the courts of New York, and in the English cases of *The John McIntyre*, *The Dordogne*, *The Ebor*, *The Resolution*, and *The Frankland*, L. R. 4 P. C. 529, the masters of both vessels were found to be in fault.

Now, let us measure the conduct of these vessels by those rules, and within moderate limits I propose to enforce them in this court. I think it is the duty of a vessel hearing the signal of a steam-ship ahead in a fog (and by ahead I do not mean dead ahead necessarily, but within one or two points upon either bow) to reduce her speed; and, if she hears a second and third whistle nearer in the same direction, it is her duty to stop and wait until signals have passed between the two vessels which shall determine upon which side each shall go, and that both vessels should proceed at the most moderate speed, keeping themselves well in command, until they bring themselves off each other's bow to such a distance as to make it absolutely certain that by continuing under check they will pass each other in safety. I do not think that they have any right to resume their full speed until they are directly or nearly abeam. There are certain disputed questions of fact in this case which we cannot settle, and we do not propose to discuss them. The best that counsel can ask of us is to take the facts as each side has sworn to them, and examine the case in the light of this testimony. I have tried too many collision cases to attempt to reconcile the testimony of the crews of different vessels where it is so conflicting as it is in this case. Nor are we at all embarrassed by that difficulty. We do not think it necessary to pay much regard to mere numerical superiority in the witnesses upon one side or the other. We shall take the salient and uncontradicted facts as they are sworn to by each side,—the course of the vessels, (in regard to which there is little temptation to deflect from the truth,) their respective signals as testified by those who made them, the angle at which the vessels came together, and the extent of the injury,—and determine, to the satisfaction of our own minds, the probabilities of the case.

Let us take the case of the Sheffield. She was proceeding up the lake, bound from Whitefish point to Keweenaw point on a course W. N. W. She was blowing her usual fog-signals, her whistle being operated by an

automatic device, which blew a fog-signal once in 58 seconds.   At 4:42
P. M., Cleveland time, she was checked to half speed.    So far I see no
criticism to be made of her conduct.    While upon this course, she
heard very faintly, at a great apparent distance, and a little upon her
starboard bow, a single blast from the Star, in answer to which she blew
two blasts and checked.    She received no answer.    Her master then
came on deck, and, hearing whistles on her starboard bow, he blew two
blasts and starboarded half a point.    The other vessel answered by a
single blast.    Now, whether that was intended as a fog-signal or a pass-
ing signal is uncertain, but at any rate it was a circumstance which called
for immediate caution.    He blew two blasts again, and that was answered
by one, and the signal was then repeated with the same response.
There was evidently a confusion of signals, and the first criticism I make
in regard to his conduct is that, as those vessels were getting nearer, he
should have stopped until he located the signals and the course of the
approaching vessel.    Instead of that, he assumed that the North Star
was blowing passing signals, though he had no assurance that they were
not fog-signals; a fog-signal and a port signal being practically the same,
though it is said the port signal is longer.    Instead of stopping, how-
ever, he ported, and ported very decidedly; and, while going W. by N.,
half N., he ported and steadied at N. W. by N.    At the same time he
ordered on more steam, as he says.    In the first place, he ported upon
the assumption that the Star was blowing a passing signal instead of a
fog-signal, which may have been untrue.    It is quite evident that, if it
had been a passing signal, the sound would have crossed from his star-
board to his port bow, or at least it would have closed in; but there is
no testimony to indicate that.    He swears that the whistles continued
upon his starboard bow until after he ported.    Now the very fact that
the signal did not close in or pass from his starboard to his port bow
should have indicated to him, as it seems to me, that the Star had not
changed her course down the lake, but was blowing a fog-signal, and
that his porting would ultimately throw him directly across the bow of
the Star.    That was his second fault.    The third fault was in not stop-
ping.    He had arrived at a point where he should have unquestionably
stopped, because he was laying out a new departure.    He was acquiesc-
ing in the signals of the North Star if her single blasts were intended as
port signals, and was throwing himself across her bow in case she should
keep her course, as the indications were she was doing.    Now he says
that he exchanged six or eight signals of one blast with the North Star.
I doubt this, but, assume it to be true, (and I wish to dispose of the
case, as far as possible, upon the assumption that each side is telling the
truth,) he exchanged six or eight signals of one blast, and then, very
much to his surprise, as he says, after he had gotten the North Star
away over on his port bow, the Star blew two blasts, which he answered
by one, and ported hard.    He did not stop then, and the signal was re-
peated.    He should not only have stopped, but he should have stopped
and reversed, and backed strong.    That was the only possible safety to
him in that emergency.    But after the second signal of two whistles, to

which he answered with one, the vessels came in sight of each other. I pass no criticism upon what occurred then upon either side. The vessels were *in extremis*, a collision was inevitable, and he had a right to go ahead at full speed, or do anything else 'that offered a possible escape. I do not criticise his conduct at that time, but, prior to the vessels coming in sight of one another, we think he was guilty of three or four manifest faults.

Let us now examine the case of the North Star. Her course, and by this I mean her direction, is certainly open to much less criticism than that of the Sheffield. Indeed, I do not know that I have any fault to find with it, even though she may have starboarded a little when she heard the signal of the Sheffield on her port bow. She claims to have been running under a check from the time the fog set in; but we think that, comparing the time she left Manitou light with the time and locality of this collision, her speed could not have been greatly reduced. Bearing in mind that she covered 66 miles in six hours and a half, her check could not have been a very slow one. Her speed must have been about 10 miles an hour. But let us assume that she was running under a check of 5 miles an hour. How does the case stand then? Did she hear the fog-signal from the Sheffield? She claims she did not, and all the witnesses produced here by the respondent claim that she did not hear the single blast of the Sheffield, and that the first signal that she heard was a blast of two whistles, which did not exceed four and five minutes before the collision. Now, gentlemen, we do not believe that. We think she must have heard the single blast of the Sheffield for some considerable time. It is true the wind was blowing over her stern, but it was a light breeze, and not such a one as would prevent an ordinary fog-signal being heard for more than a mile. We think that she must have heard this fog-signal—*First*, because the mate says that he heard it; and, *second*, because the protest indicates that he heard it. The protest says: "Heard steamer blowing fog-signal on starboard bow about 5:10 P. M. Few minutes after, heard this steamer giving two blasts on the starboard bow." Now, undoubtedly the whistle she heard on her starboard bow was the fog-signal of the Sheffield. These protests are, I think, very cogent evidence. They are made when the memory of the witnesses is fresh, and nothing is present in their minds but the facts of the collision. They are unadulterated by legal advice, and are made at a time when no temptation to deviate from the letter of truth has presented itself to them. But, in addition to the testimony of the mate and of the protest, the witness King, who acted as porter, and who was lying in his berth, says that he heard the single blast of this vessel three or four times, and all of a sudden they changed to two blasts, and he jumped out of his berth and ran ahead, evidently thinking there was danger of a collision. We have no indication that the Star moderated her speed up to that time beyond the check at which she had been going since the fog set in. In fact, it was about that time that the master sent the mate to the engineer to tell him to hurry up a little,—to put on a little more steam,—while signals of two blasts were being blown at a dis-

tance not exceeding a mile. A point upon which there is a good deal of testimony and a great deal of doubt is from which steamer did the first signal of two blasts come? We cannot answer that question. We can only say that we are inclined to think the signal came first from the Star, and this because the Sheffield was under a port-wheel at that time, and to have blown two blasts of a whistle while the steamer was porting would indicate a degree of recklessness inconsistent with good sense. Indeed, it seems to us incredible that a steamer should be blowing a signal of two blasts while under a port-wheel. As to what took place at that time, we refer to the allegations of the answer, although it is qualified to some extent by the oral testimony:

"As soon as this was blown, danger of collision was apprehended, and the North Star promptly answered this signal last blown by the Sheffield by adhering to her passing signal of two blasts, and her master immediately took the precaution to check down still further the speed of the North Star, which was then moderate. The Sheffield, however, again blew a signal of one blast of her whistle, still on the North Star's starboard bow, but closer. The engine of the North Star was then immediately stopped, and, while this order was being obeyed, the Sheffield hove in sight, near to and heading across the North Star's bow and course, from starboard to port. The vessels were then so close to each other that a collision seemed inevitable, but, notwithstanding this, the master of the North Star immediately ordered her wheel to port, so that she might swing under the stern of the Sheffield, and possibly pass her, and ordered the engine to back, and immediately followed this order by an order to back strong, and, in response to this order, every available pound of steam was given the engine."

Now it is manifest that at the time this signal of two blasts was heard on the North Star the signals of the two steamers were conflicting, and the circumstances all indicate that they could not have been more than a mile apart. The vessels were approaching each other at a speed which would bring them together in five minutes, and it was the instant duty of the North Star to stop and back. It is claimed that she did this, but it is also uncontradicted that she checked. Now, why did she check? There was no reason for it. Her duty was to stop, and her counsel have recognized this as her duty by saying that a cluster of signals to check, to stop, to back, and to back strong were all given substantially at once, and as one order. In view of the allegations of the answer, we cannot believe that. The protest does not indicate that any such celerity of movement was manifested. The mate went down to the engine room, and when he came back these orders were given, and they all say they were given successively, and not as if one order had been given. But there was at that time hanging up in the engine room a direction to this effect: "Where a vessel is going ahead, and a signal of two bells is given, that is an order to back and back strong." That is the signal that should have been given beyond all possible question. My own view is, and in this the nautical assessors concur with me, that the first order given was to check; that they waited until they got another blast from the Sheffield, and then they stopped; that the Sheffield immediately hove in sight, when they reversed their engines, but too late to be of any

service. Now we have no doubt that if, when the signal to check was given, an order had been given to back strong, this collision would have been avoided. The consequence was that she ran into the Sheffield four or five feet. What speed does that indicate? Upon the one hand, it is said by a witness for the Star, who has made a mathematical calculation, based upon the weight of the Star and the strength of the Sheffield's hull, that her speed could not have exceeded a mile an hour. But we do not think this witness sufficiently estimates the resisting power of the Sheffield, and our opinions rather coincide with that of the equally intelligent witnesses produced by the Sheffield,—Capt. Kirby and Mr. Angstrom,—who testified that in their opinion she must have been going at from five to seven miles an hour. The experienced seamen who sit with me in this case giv it as their opinion that she must have been going, considering the depth of the cut and all the facts, at a speed of about five miles an hour, and I concur in that opinion.

In further corroboration of this, we have the testimony of a large number of witnesses upon the Sheffield, who were looking for the Star as she hove in sight, and say that she came at them with "a large bone in her teeth." Upon the other hand, the witnesses upon the Star seem to have taken the precaution to look over her stem and say there was no bone there. We deem it extremely improbable, however, that the witnesses upon the Star should have been looking at her cut-water. They had undoubtedly taken the alarm, and were on the lookout for the appearance of the Sheffield. We are clearly of the opinion that the Star was at fault for not taking prompter measures to stop and reverse her engine.

There must be a decree dividing the damages, and referring the case to a commissioner to compute and report the same.