<hr />

DONNELL v. BOSTON TOWBOAT CO.

BOSTON TOWBOAT CO. v. DONNELL.

(Circuit Court of Appeals, First Circuit. October 4, 1898.)

Nos. 210 and 211.

1. COLLISION—TUG AND TOW—FAILURE TO SLACKEN SPEED IN FOG.
    Unless under special circumstances, a tug and tow are bound by articles 13, and 18 of the sailing rules; and a steamship, having in tow a barge 280 feet in length, and carrying sail, which saw an approaching bank of fog five or six minutes before entering it, but did not signal the tow to take in sail until after entering the fog, and did not slacken speed

even after hearing the foghorn of an approaching schooner, and was going at the rate of between eight and nine knots when the tow collided with the schooner, was at fault for the collision.

2. SAME—CHANGE OF COURSE BY SAILING VESSEL.

Where signals were exchanged between a steamship and a schooner approaching each other at night in a fog, the steamer has a right to rely on the sailing vessel keeping her course; and if it is changed, and a collision follows, the burden is on the schooner to prove that the change of course did not contribute to the collision.

3. SAME—LIBEL FOR DAMAGES—ISSUES.

A libelant cannot claim that a tow was in fault for a collision, and should share in a division of the damages, where his libel alleges the fault to have been wholly that of those in charge of the tug.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

This was a libel by William T. Donnell against the Boston Towboat Company for the sinking of the schooner Josiah R. Smith in a collision. From the decree of the circuit court, both parties appeal.

Eugene P. Carver (Edward E. Blodgett, on brief), for libelant.

Lewis S. Dabney (Frederic Cunningham, on brief), for defendant.

Before GRAY, Circuit Justice, and COLT and PUTNAM, Circuit Judges.

COLT, Circuit Judge. These are cross appeals from the decree of the district court in the case of William T. Donnell against the Boston Towboat Company, which was a libel to recover damages for a collision between the schooner Josiah R. Smith and the barge Lone Star, in tow of the steamship Orion. Donnell is the managing owner of the schooner, and the libel was brought on behalf of himself and other part owners. Both the steamship and the barge are owned by the defendant, the Boston Towboat Company. The Josiah R. Smith was a three-masted schooner, 178 feet long, 35 feet wide, and 669 tons net register. She was loaded with a cargo of coal, and was proceeding to the eastward on a voyage from Baltimore to Boston. The Orion was an ocean steamer, built of iron, 276 feet long, 1,167 tons net register, and was towing the Lone Star by a steel hawser 125 fathoms in length. The Lone Star was originally a steamer, and had been altered into a barge. She was built of iron, and was 281 feet long. She had three masts, and carried some sails. The steamship and tow were proceeding to the westward on a voyage from Boston to Newport News without cargo.

The collision occurred soon after 9 p. m., on April 7, 1895, outside the westerly entrance of Vineyard Sound, some 2¼ miles distant from Gay Head, and about a mile from Devil's Bridge. The night was clear until a few minutes before the collision, when a thick fog suddenly shut in. The wind was about south, and there was a fair breeze. The schooner was heading E. by N. ½ N., with all sails set except her balloon jib. She was on the starboard tack, and her speed was about five knots. The steamship and the barge were heading S. W. by W., and their speed was between eight and nine knots. The barge had her sails set. According to the schooner's account, shortly before 9 o'clock, the fog setting in, the master ordered the mechanical foghorn to sound three distinct blasts, which was done every minute until the collision. Shortly after 9 o'clock the fog whistle of an approaching

steamer was heard about a point and a half on the port bow of the schooner. The signal was three blasts, showing that it was a steamer with a tow. The master of the schooner, knowing he was well on the starboard side of the channel, in order to give the steamer and tow plenty of room, ordered the man at the wheel to luff a little; and, while the schooner was luffing and heading about east, the steamship Orion was seen crossing the bow of the schooner right ahead, at a high rate of speed. Thereupon the master, seeing that a collision with the steamer would take place unless he could avoid it, ordered the man at the wheel to come back to his course, by which action a collision with the Orion was prevented. But, as the schooner was keeping off, the barge Lone Star at once loomed up in the fog, and struck the schooner, just aft of the fore rigging on the port side, cutting in as far as the main hatch, and causing her at once to fill with water and sink. According to the steamship's account, when the fog set in, the master at once blew a signal to the barge to take in all sail, in order to slow down, which she could not safely do while the barge had her sails set. Immediately after, the steamship began blowing three short blasts of her steam whistle at intervals of not more than one minute, showing she was a steamer with a tow. After signaling the barge, the master of the steamship heard three blasts of a horn, which seemed to bear about three points on his starboard bow. The master ordered the helm of the steamship to be put to starboard, and at the same time gave two short blasts of his steam whistle, indicating he was directing his course to port. He then signaled the barge to starboard. Shortly after, the master of the steamship again heard three blasts of a horn; and this time it appeared somewhat more abeam of the steamship, on her starboard side; and immediately afterwards he saw the topsails of a schooner, which proved to be the Josiah R. Smith, a little abaft of his starboard beam, a short distance away, and going in the direction of the barge.

The court below found the steamer and her tow were at fault for proceeding at too high a rate of speed in a thick fog, and the schooner was at fault for changing her course by porting her wheel after the signal of the steamer was heard, and directed the damages to be divided. The evidence is conclusive that at the time of the collision the steamer was going between eight and nine knots an hour in a thick fog, and that she continued to proceed at the same speed after hearing the foghorn of the schooner.

Article 13 of the sailing rules (23 Stat. 438) is as follows:

"Every ship, whether a sailing ship or a steamship, shall in a fog, mist or falling snow, go at a moderate rate of speed."

The rule as to what constitutes moderate speed varies somewhat in different cases. The speed must be such as will enable the steamer to avoid the other vessel after she has been able to make her out. The Cambridge, 2 Low. 21, 23, Fed. Cas. No. 2,334; Dolner v. The Monticello, 1 Holmes, 7, 13, Fed. Cas. No. 3,971; The City of Brooklyn, 1 Prob. Div. 276.

In The Bolivia, 1 C. C. A. 221, 49 Fed. 169, 171, the rule is thus stated by the circuit court of appeals for the Second circuit:

"The rule is firmly established in this country, and also in England, that the speed of a steamship is not moderate, at least in localities where there

is a likelihood of meeting other vessels, if it is such that she cannot reverse her engines and be brought to a standstill within the distance at which, in the condition of the fog, she can discover another vessel." The Colorado, 91 U. S. 692; The Eleanora, 17 Blatchf. 88, Fed. Cas. No. 4,335; The Martello, 34 Fed. 71, 39 Fed. 505.

Article 18 is as follows:

"Every steamship when approaching another ship so as to involve risk of collision, shall slacken her speed, or stop and reverse, if necessary."

In the case of The John McIntyre, 5 Asp. 278, 279, it was held that, where a steamer heard the fog signal of another vessel more than once from such a direction as to indicate that the vessel was approaching her, it was her duty to at once stop and reverse.

"If a steamer in a thick fog, so thick that she can hardly see before her, hears another vessel in her neighborhood on either bow, not being able to see her, and she herself not going at her slowest pace, the question is whether, under those circumstances, the officer in charge of the steamer ought not to conclude that it is necessary, in order to avoid risk of collision, that he should stop and reverse. I do not hesitate to lay down the rule, not strictly as a matter of law, but as a matter of conduct, that, the moment such circumstances as these happen, it is necessary, under the article, to stop and reverse. * * * However difficult it may be for persons in command of steamers to do what the law directs, in my opinion we must hold strictly that in a dense fog, the moment another vessel is found on the bow, or in near vicinity on either bow, and she herself is going at any speed, it has then become necessary, under the 18th rule, not merely to slacken speed, but instantly to stop and reverse." The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122; The Alberta, 23 Fed. 807; The North Star, 43 Fed. 807; The Rosetta, 6 Asp. 310; The Resolution, Id. 363.

In order to free herself from fault under articles 13 and 18, the steamer offers as an excuse that she had not time after meeting the fog to slow down or stop before the collision with safety to herself and her tow, because the barge had not had time to get in her sail. It is contended that a tug with vessels in tow is in a different condition from one unincumbered. She is not mistress of her motions. She cannot advance, recede, or turn either way at discretion. She is bound to consult their safety as well as her own. She must see that what clears her of danger does not put them in peril. A tug, therefore, is not in fault for not doing exactly what a steamer not so incumbered would have done in the same situation. The Lord Bangor [1896] Prob. Div. 28; The Syracuse, 9 Wall. 672; The Alleghany, Id. 522; The Galileo, 24 Fed. 386, 391; The Lucy, 20 C. C. A. 660, 74 Fed. 572; The Josephine B., 7 C. C. A. 495, 58 Fed. 813; The Rose Culkin, 52 Fed. 328, 330. Speaking generally, it may be said that these cases relate to the relative duties as between a steamer without a tow and a steamer with a tow, and are not directly in point. Although there may be some authority for holding that under the circumstances the Orion could not have been required to have stopped entirely in the fog, this does not relieve her of her duty of slowing down sooner. Unless under special circumstances, we think a tug and tow must be held to be bound by articles 13 and 18. Considering the danger to navigation from a tug with a tow, of the character of the Orion and Lone Star, there is good reason for maintaining that they should be required to exercise the utmost care. Although it is not permitted to condemn a tow of this character as unlawful, we should hold tugs which navigate the coast with long and hazardous

fleets to the use of extreme care, in the interests of common safety. The Berkshire, 21 C. C. A. 169, 74 Fed. 906; The Gladiator, 25 C. C. A. 32, 79 Fed. 445.

But conceding that, after entering the fog, the steamer in this case could not have slowed down with safety to herself and her tow, the evidence shows that she saw the fog bank approaching at least some minutes before it enveloped her, and that she made no movement towards lessening her speed during this time. Knowing that she could not immediately slow down after entering the fog, the steamer was at fault in not giving her signal to the barge, and commencing to slow down as soon as she saw the fog. That the steamer did not take this precaution, we think, is made clear from the following testimony:

The master of the steamer testifies as follows:

"Q. 53. Now, was that a gradual fog,—did it come on gradually, or not? A. No; we shot right into it, or it came onto us. Well, I can't say. It was probably five or six minutes. I don't know as it was more than that, that we could see it. Q. 54. You could see it five or six minutes before you came into it? A. Yes, sir. * * * Q. 91. And what was the first thing you did after the fog shut in? A. The first thing I did was to blow to take in sail on the barge. Q. 92. What signal did you give for that? A. Two long and two short. * * * Q. 95. Is that your usual course of proceeding when fog shuts down? A. Yes, sir; at once; just as soon as the fog sets in I blow to take in sail."

Linscott, the second mate of the steamer, on watch at the time of the collision, testifies:

"Q. 23. Now, after the fog came up, and after you had begun to give your regular fog signals, did you give any other signal? A. Not until we heard these foghorns. Oh, yes, we did; we signaled to the barge, as soon as the fog shut in, to shorten sail. * * * Q. 29. How long after the fog shut in was it that you gave the signal to the barge? A. Well, it was about as soon as the captain could blow the whistle,—as soon as the fog closed in. The first thing that was done was to give the signal."

The master of the tug testifies:

"Q. 35. Now, after the fog shut in, what did you do first? Did you get any signal from the steamer? A. I started hauling down my sails before he signaled me to take in sail; and, while I was in the act of hauling down my main and mizzen staysail, he blowed to take in sail. * * * Q. 38. What sail had you got in before you got any signal? A. I had got in the main staysail and the mizzen staysail. Q. 39. What were you taking in at the time you got the signal? A. I was just taking in the main staysail."

Taking this testimony all together, it proves that the Orion gave no signal to take in sail until after she ran into the fog, and that she was so dilatory in this respect that the master of the barge began to take in sail before she gave any signal.

If the steamer maintains the proposition, on the authority of The Syracuse, The Alleghany, and The Lord Bangor, ubi supra, that it was impossible to slow down quickly after entering the fog, on account of danger to the barge, this leaves the burden resting on her to show that she could not have commenced slowing down before running into the fog. This she not only fails to do, but the evidence on this point is clearly against her. It is unnecessary to examine any other of the alleged faults on the part of the steamer.

We will next consider the question whether the schooner was at fault in changing her course by porting her wheel after the signal

of the steamer was heard ahead.    This was not a case of in extremis. The libel states that it was in order to give "the said steamer and tow plenty of room."    The answer states that the schooner's fog signals seemed to bear about three points on the starboard bow of the steamer, and that the master of the steamer ordered her helm to be put to starboard, which was done, and he gave two short blasts of his whistle to indicate that he was directing his course to port, and, within two or three seconds later, he signaled the barge to starboard.    This allegation is supported by the testimony, and it shows that, in order to give the schooner a margin, the master of the steamer put her bow to port, and signaled the barge to do the same, which he had a right to do, having at the same time a right to assume that the schooner would hold her course.    The schooner, however, put her bow to the starboard, thus neutralizing, in part at least, the efforts of the steamer to give her more room.

The schooner claims that the place where the collision occurred was a "narrow channel," within article 21, and that, therefore, the steamer was bound to keep on her starboard side of the fairway; that the schooner was justified in assuming she would do so, and was consequently justified in porting her helm, and going on her own starboard side of the channel, in order to give the steamer more fairway.    But there is no evidence to support the position that the width of Vineyard Sound at the place of collision was a "narrow channel."    The testimony of the captain of the Orion, and the chart, point to the contrary. It appears that the sound in this locality has a navigable width of about six miles.    A steamer has a right to rely on a sailing vessel keeping her course.    The Illinois, 103 U. S. 298; The Martello, 39 Fed. 505; The Allianca, Id. 476.    The burden is on the schooner to prove, not only that her change of course did not contribute to the collision, but that it could not have done so.    The Pennsylvania, 19 Wall. 125, 136; Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 136 U. S. 408, 422, 10 Sup. Ct. 934; Belden v. Chase, 150 U. S. 674, 699, 14 Sup. Ct. 264; The Martello, 153 U. S. 64, 74, 14 Sup. Ct. 723; The Fanny M. Carvill, 13 App. Cas. 454, 455, note; The Duke of Buccleuch, 15 Prob. Div. 86 [1891] App. Cas. 310.

It is assumed on the part of the schooner that the learned judge of the district court found that the barge was at fault, as well as the Orion.    This does not necessarily follow from the expression used by the court in its opinion:    "The Orion and her tow were at fault for this collision."    This was a libel in personam against the owner of the Orion, who was also the owner of the tow.    By this expression the court may have had in mind joint ownership, rather than the idea that both vessels were at fault.    In the same paragraph the court only specifies the fault of the steamer.    The libel alleges "that the said collision and the damage resulting therefrom were caused wholly by the fault of those on board the said steamship Orion, and those in charge of her."    It then specifies certain faults, all of which attach to the steamship, and none to the barge.    This was not merely a general allegation, which left open an opportunity for proving the barge was in fault, but it expressly excluded the barge.    The schooner is not at liberty to claim on this appeal that the barge was at fault, in view of the specific and positive allegations of the libel, and in the

absence from the record of anything in the nature of a waiver on the part of the defendant. Under these circumstances, the proposition of the schooner that, there being three vessels in fault, the damages should be divided into three parts, cannot be considered. The decree of the district court is affirmed, without additional interest and without costs to either party in this court.