## STATE OF MARYLAND, for Use of DAWSON v. STANDARD OIL CO. OF NEW JERSEY.

(District Court, D. Maryland. October 26, 1925.)

No. 1312.

1. **Collision** ⊙=113—Passenger on boat held not chargeable with contributory negligence in effort to save himself after collision.

Passenger on small boat held not chargeable with contributory negligence in that, after collision with larger boat, he attempted, while scraping along its side, to get abroad larger boat and was drowned.

2. **Collision** ⊙=93—Evidence held to show negligence of master of boat contributing to collision.

Where vessels, one small and one larger, were on crossing courses but no passing signal had been given, evidence tending to show that master of smaller vessel deliberately sailed beneath bow of larger vessel, which had given no indication that she was aware of his existence, and was struck, held to establish negligence on master's part.

3. **Collision** ⊙=105—Evidence held to show vessel's negligent violation of rules respecting use of channel and passing signals which contributed to collision.

Evidence held to establish negligence of vessel in proceeding down wrong side of channel and in failing to give passing signals, in violation of Board of United States Supervising Inspectors rule 3, promulgated under Act June 7, 1897, § 2, as amended by Act May 25, 1914 (Comp. St. § 7906) and Statutory Rules, art. 25 (Comp. St. § 7899), which contributed to collision.

4. **Collision** ⊙=104—Vessel shown to have been negligent and seeking to avoid liability for collision has burden of proof that negligence could not have contributed.

Vessel shown to have been negligent in breach of inspectors' statutory rules, and seeking to avoid liability for resulting collision, has burden of showing that her breaches of rules could not have contributed to disaster.

5. **Collision** ⊙=7—Rule promulgated by Board of United States Supervising Inspectors held not invalid as inconsistent with statutory rules.

Board of United States Supervising Inspectors rule 3, promulgated under Act June 7, 1897, § 2, as amended by Act May 25, 1914 (Comp. St. § 7906), which relates to passing signals and imposes duty in addition to those required by Statutory Rules, art. 18, rule 1 (Comp. St. § 7892), is not invalid as inconsistent therewith.

In Admiralty. Libel by the State of Maryland, for the use of Ethel Stephens Dawson, widow of William Dawson, deceased, against the Standard Oil Company of New Jersey. Decree for libelant.

Emory, Beeuwkes & Skeen, of Baltimore, Md., for libelant.

Janney, Ober, Slingluff & Williams and Edward F. Johnson, all of Baltimore, Md., for Standard Oil Co. of New Jersey.

SOPER, District Judge. On October 10, 1924, William Dawson, without fault on his part, was drowned in the Potomac river by reason of a collision between the skipjack Kittywink, on which he was a passenger, and the motor vessel Petrolia No. 7. A libel was filed in the name of the state of Maryland, for the use of the widow of the deceased, against the Standard Oil Company of New Jersey, owner of the Petrolia, for the payment of damages occasioned by his death.

The accident occurred at 10 p. m. on a calm, clear, moonlight night, in the neighborhood of Indian Head on the Potomac river. The Kittywink was on her way up the river, bound for Washington. She had left Mundy Point, Va., at sunrise, in the sole charge of her captain and owner, Samuel

J. Brann, who is a dredger and fisherman by occupation. Dawson was on board as a passenger and, as he was ignorant of vessels, had no part in the navigation. The voyage up the river was interrupted only by a stop of two hours from 10 a. m. until noon at Colonial Beach, Va. The Kittywink is 33 feet in length, with one mast, and carries a foresail and jib. It is equipped with a nine horse power engine. At the time of the collision, it was proceeding under its foresail with the engine in operation. It was making a speed of approximately five miles an hour. The Petrolia is an oil barge, 145 feet in length, equipped with two oil engines. Her pilot house is about 100 feet aft from the bow. She left Alexandria at 8 p. m. and, at the time of the collision, had traveled 16 miles down the river to Indian Head, making some eight knots per hour, according to her crew. Capt. L. M. Carlton of the Petrolia had steered her all the way. No other person was on deck except a seaman who was on the lookout in the pilot house with the captain. The chief engineer and an oiler were on duty in the engine room, and the remainder of the crew were in bed.

The collision occurred at a point 200 yards south of the dock at Indian Head, at a distance estimated by the captain of the skipjack to be 250 yards, and by the captain of the oil barge a quarter of a mile from the Maryland shore. According to either estimate, the point of collision was to the east of the center of the channel. At this point the channel is over 800 yards in width and its eastern edge is nearly 200 yards from the Maryland shore.

As may be expected, there is a sharp conflict in the testimony. On the part of the Kittywink, the only witness to the collision was Capt. Brann, and his testimony is not easy to understand. At one time during his examination, he stated that he first saw the Petrolia when she came around the buoy near the Maryland shore above the wharf at Indian Head, some 1,500 yards away. Later he testified that when he first saw the Petrolia, she was a quarter of a mile away. He said that the position of the Kittywink at that moment was approximately 200 or 250 yards below the old dock, and the same distance from the Maryland shore; but he also placed the point of collision 200 yards below the old dock, and 250 yards from the Maryland shore. Obviously, these estimates make no allowance for the distance which the Kittywink covered between the time when the Petrolia was first sighted, and the time when the collision occurred. Even if the initial distance between the vessels was only a quarter of a mile, the Kittywink would have proceeded very nearly to the Maryland shore in the interval, since she was headed, according to Brann, for a point on the Maryland shore a short distance south of the pier.

Aside from these circumstances, his story of the accident is clear enough. He was proceeding up the river in the direction indicated, and caught sight of the green light of the Petrolia when she was still at a safe distance away. He saw only this light from the beginning until the collision happened. During all of this time, only the red light of the Kittywink was visible to the Petrolia. In other words, the vessels were on crossing courses, and he had the right of way and the obligation to maintain his course and speed across the Petrolia's bow. Neither vessel gave any signal to the other, but Brann, supposing that the Petrolia would see his red light and alter her course so as to pass beneath his stern, held his course and speed. According to his testimony, the Petrolia did the same and finally struck him with her bow three feet aft of the bow of his vessel. But the impact was very slight indeed, since in fact a very short time before the collision the engines of the Petrolia were put full speed astern and her bow was swung to port. No damage at all was done to the Petrolia, and no substantial damage to the hull of the Kittywink. Her only injury was the breaking of her bowsprit, which in some way seems to have caused the boom to fall and foul the davits upon which her lifeboat was suspended at the stern.

[1] The blow was sufficient to cause the stern of the Kittywink to swing around so that she was side by side with the Petrolia. When the vessels collided, Dawson was standing on the deck. He was not thrown from his standing position, but when the vessels came parallel, he endeavored to climb aboard the Petrolia, and in this attempt fell overboard and was drowned. Had he remained on board the Kittywink, he would have suffered no injury, but doubtless he was excited and apprehensive that she had suffered substantial injury. Her engines were not stopped until after the collision, so that after her port side came in contact with the starboard bow of the Petrolia, she went ahead scraping along the latter's side, making it difficult for Dawson to get aboard. His attempt was clearly caused by the collision. It was an automatic effort to save

himself, and there is no room for the argument that negligence on his part contributed to his death.

Capt. Carlton of the Petrolia testified that after rounding the buoy, he saw the Kittywink some 1,500 yards ahead, about three-fourths of a point or a point on his starboard side, showing only her green light. At that time he was about the middle of the channel. Since each vessel was showing the other the green light, he intended to pass starboard to starboard, and hence held his course. He gave no passing signals, believing that none were necessary. When the vessels were only 200 or 300 feet apart, the Kittywink suddenly changed her course, exhibiting her red light. It was then too late to pass under her stern. The Petrolia blew four blasts of her whistle as a danger signal. Her engines were put full speed astern, and the helm hard astarboard, with the result that when the vessels came together, the impact as above stated was very slight. The testimony of Capt. Carlton is corroborated by the seaman in the pilot house, and in part by the oiler, who was on deck a short time before the collision and saw the green light of the Kittywink ahead. The captain of the latter vessel denies that danger signals were blown, but the weight of the testimony given, not only by members of the crew already mentioned, but by the others who were awakened from their sleep, as well as by one other witness on shore, justifies the finding that the signals were given.

[2] The evidence establishes negligence on the part of Brann. His testimony as to the location of the vessels is so confusing as to lead one to conclude that he did not see the Petrolia until he was close upon her —an oversight the more comprehensible since he had had the sole management of his vessel from dawn till 10 p. m. with only two hours' intermission before noon. His action in crossing under the bow of the larger vessel, which had given no recognition of his presence, confirms the belief that he did not see her until too late. It is true that he says that for a considerable interval before the collision he had been on a long tack headed for a point just south of the old dock at Indian Head, in order to use the wind to the best advantage. At this point the normal course of a vessel proceeding up the river would have been in a generally northeasterly direction, with the dock on the starboard bow, and since the wind was from the northwest, there was little occasion for tacking, especially in a vessel

propelled by an engine. In any event, there would have been no difficulty in avoiding the collision by a slight alteration of his course had he seen fit to make it. Even supposing that from the beginning the red light of the Kittywink had been visible to the Petrolia, there was a failure on Brann's part to exercise prudence to avoid the collision, when he deliberately sailed beneath the bow of the Petrolia, which had given no indication that she was aware of his existence. The rules of navigation are not to be blindly followed to certain disaster. The Gladys, 144 F. 653, 75 C. C. A. 455; The John H. Starin, 162 F. 146, 89 C. C. A. 170.

[3] The more important question in the case is the negligence vel non of the Petrolia. From what has been said, it may be gathered that in the opinion of the court the testimony of Capt. Brann alone is not sufficient to support the burden of proof upon the libelant to show the negligence of the Petrolia. Her own testimony shows that she was not free from fault. There are two rules of navigation which are especially applicable to the Petrolia's case. The Inland Pilot Rules (Act of June 7, 1897 [30 Stat. 100]) provide in article 18, rule 1 (Comp. St. § 7892), that steam vessels approaching each other, head and head, shall each pass on the port side of the other, and shall each give as a signal of her intention, one short and distinct blast of her whistle, but if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts, and they shall pass on the starboard side of each other. The foregoing only applies to cases where vessels are meeting end on, or nearly end on, and by night to cases in which each vessel is in such a position as to see both the sidelights of the other. It does not apply by night to cases where the green light of one vessel is opposed to the green light of another. But the rules and regulations promulgated by the Board of United States Supervising Inspectors, under the authority of section 2 of the Act of June 7, 1897, as amended by the Act of May 25, 1914 (38 Stat. 381 [Comp. St. § 7906]), contain not only the statutory rule above set out, but in connection therewith rule 3, to the effect that the signals for passing, by the blowing of the whistle, shall be given and answered by pilots not only when meeting head and head, or nearly so, but at all times when

steam vessels are in sight of each other when passing or meeting at a distance within half a mile of each other, and whether passing starboard or port. Illustrative diagrams accompanying the rules show that when vessels are exhibiting to each other only the green light and are about to pass starboard to starboard, each pilot should previously signify his intention by two blasts of the whistle. Furthermore, article 25 of the Statutory Rules (Comp. St. § 7899) provides that in narrow channels, every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel.

According to her own testimony, the Petrolia violated both rule 3 of the Inspectors' Rules and article 25 of the Statutory Rules. Her captain says that she was proceeding down the river in the middle of the channel. He fixes the point of collision one-quarter of a mile from the Maryland shore, which would be some 200 yards on the wrong side of the middle of the channel. Furthermore, the Petrolia, although blowing danger signals when the boats were some 200 or 300 feet apart, failed to give any passing signal when the boats were at a safe distance. The question is whether the violation of one or both of these rules contributed to the collision. Carlton says that at the beginning, each vessel showed to the other her green light. Then the Kittywink was nearly a mile away and only three-quarters of a point or a point on the Petrolia's bow. The Petrolia was in the middle of the channel, and since it was safe and practicable, it was her duty to proceed to that side of the fairway which lay on her starboard side. Had she done so she would have shown at first both lights and later her red light to the Kittywink, and by one blast of the whistle could have signified an intention to pass port to port. But she held her course and proceeded down mid-channel, or, what is more likely, to her port side of the channel. Assuming that each vessel showed to the other her green light, the Petrolia gave no passing signal as required by inspectors' rule 3.

[4] Under these circumstances, the burden of proof is on the Petrolia to show, not only that her breaches of the rules probably did not contribute to the disaster, but could not have done so. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; Belden v. Chase, 150 U. S. 674, 14 S. Ct. 264, 37 L. Ed. 1218; The Glendale v. Evich, 81 F. 633, 26 C. C. A. 500; Donnell v. Boston Towboat Co., 89 F. 757, 32 C. C. A. 331; The Acilia; The Crathorne, 120 F. 455, 56 C. C. A. 605; The Straits of Dover; The Bluefield, 120 F. 900, 58 C. C. A. 86; The Edward Smith, 135 F. 32, 67 C. C. A. 506; The Lauretta Speddin, 184 F. 283–286, 106 C. C. A. 425; Burley v. Compagnie De Navigation Francaise, 194 F. 335, 115 C. C. A. 199.

The whole fault, the Petrolia charges, was the sudden and unaccountable change of course of the Kittywink. If it should be established beyond question that each vessel saw the other from a point of safety, and each understood it to be the intention of the other to pass to starboard, a totally unexpected maneuver on the part of the Kittywink might be accepted as the sole cause of collision and the Petrolia's breach of the rules as irrelevant. But this is not the situation. Brann's testimony is that he saw the Petrolia from the time she rounded the buoy and thought she would pass under his stern. At the end he apparently acted upon this assumption; but it is a more reasonable conclusion that he did not see the Petrolia at all until it was too late. It is highly probable that if the Petrolia had proceeded down the right side of the channel, or if she had given the proper passing signal, or better than either, if she had obeyed both rules, Brann would have heard and seen her in time and the collision would have been avoided. It was obvious to Carlton that the vessels, if not upon opposite, were upon closely parallel, courses, and that he was on the wrong side of the channel. Aside from the rules, ordinary care should have suggested some indication to the Kittywink of the course he intended to take.

[5] It is urged by the respondent that supervisors' rule 3 is invalid by reason of inconsistency with article 18, rule 1 of the statute. It was held in the case of The Aurelia (D. C.) 183 F. 341, that the Board of Supervising Inspectors has no authority to promulgate regulations restricting the plain rules which have been enacted by Congress itself to guard against collisions, and that the limitation of supervisors' rule 3 as to signals to vessels at a distance within a half mile of each other did not relax the obligation imposed by article 28 of the statutory rules that when vessels are in sight of one another, a steam vessel under way, whose engines are going at full speed astern, shall indicate that fact by three short blasts of the whistle. In the case at bar, it is contended that article 18 fixes the courses and signals to be employed when vessels are approaching each other, end on, or nearly so,

but expressly provides that the rule shall not apply to vessels not in this situation— for instance, when the green light of one vessel is opposed at night to the green light of the other. Here, it is argued, is an express enactment that vessels so approaching need not give the passing signals, and therefore the Board of Supervising Inspectors were without authority to require them. Section 2 of the act as amended provides, however, that the board shall establish such rules to be observed by steam vessels passing each other, not inconsistent with the provisions of the act, as they may from time to time deem necessary for safety. It has accordingly been provided that vessels shall give passing signals not only when meeting end on, but also when passing or meeting in other situations. This is not a rule inconsistent with the statute, but an additional rule promulgated in the interest of safety.

A decree against the respondent, as owner of the Petrolia, will be signed.