**SOUTHERN TRANSP. CO. v. DAUNTLESS TOWING LINE et al.**

**No. 191.**

Circuit Court of Appeals, Second Circuit.

Jan. 26, 1944.

Anthony V. Lynch, Jr., of New York City, for appellant.

Christopher E. Heckman, of New York City, for Canal Lakes Towing Co.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The Dauntless Towing Line appeals from a decree in the admiralty holding it solely liable for a collision in the Kill van Kull on the night of November 27, 1942. The collision occurred close to the Staten Island shore, about 150 feet off the "Fighting Dock"—a dock 100 to 150 feet east of the Bayonne Bridge. The contact was between the libellant's barge, "Cumberland," made fast to the tug, "Calatco," of the Canal Lakes Towing Corporation; and a tank barge,—the "Catherine O'Boyle"—made fast to the "Dauntless" of the Dauntless Towing Line. It resulted in substantial injury to both barges. The "Calatco" was bound east, and had the "Cumberland" on her port hand; she had gone between Shooters Island and the Staten Island shore, and was about off Buoy 3A when she first made out the "Dauntless" and her tow. The "Dauntless" had the "Catherine O'Boyle" on her starboard hand, and was bound west. As usual the testimony as to the whistles is contradictory; the "Calatco" says that, when about off the buoy, seeing the green light of the "Dauntless" near the Staten Island shore, she blew one blast; that, receiving no answer, she repeated this signal shortly thereafter; and that,

when the "Dauntless" countered with two, the "Calatco" stopped, backed, and blew the alarm. (Although the judge did not specifically find which version was correct, he did express a general preference for the veracity of the "Calatco's" witnesses, which we assume to mean that in case of dispute he accepted their story). When six hundred yards or more to the east of the Bayonne Bridge, the "Dauntless" says that she made out the tow of the "Calatco" just about opposite Bergen Point Light and very near to it; whereupon she gave a double blast signal; being herself about 150 feet off the Staten Island shore. This the "Dauntless" thought the "Calatco" answered by two blasts; and further inferred that the situation was shaping into a starboard to starboard passing, because the red light of the "Calatco" which she had been showing, was then shut out, and her green light appeared. Suddenly, when almost under Bayonne Bridge, the "Calatco" swung to starboard, and into the "Catherine O'Boyle." The judge apparently disbelieved this story, and found the "Dauntless" solely at fault for being out of position in the channel; and the "Calatco" not at fault.

▉ The first question is as to the fault of the "Dauntless." She had been obliged to pass a tow, starboard to starboard, a little west of the Bergen Point Ferry; but according to her master, after she had passed it, she was still in midstream. The only explanation for her then going over to the south shore is that he saw the "Calatco" and her tow on the north side of the channel near Bergen Point Light, and also that he wished to get out of the force of the ebb tide. Since it is entirely clear that the "Calatco" never was anywhere near the position in which he placed her, the true explanation is obviously that he went over to the wrong side for his own convenience; and that is the purport of what he said before the Inspectors. Responsibility for this fault the "Dauntless" attempts to avoid by saying that it was a "circumstance"—which we interpret as meaning a "condition"—not a "cause," of the collision that followed. That distinction, though not sound as formal reasoning, does represent an important difference in legal liability, if properly understood. It means that, when a vessel's position and proposed course is apparent to another vessel which must navigate to avoid her, it is of no conse-

quence that that position and that proposed course is the result of the first vessel's fault, provided the other vessel makes her out in time to avoid her, and is so situated that she can do so by accommodating her own navigation. In short, the second vessel may not disregard an apparent danger merely because it has resulted from the first vessel's fault. This we have often held. The Socony No. 19, 2 Cir., 29 F.2d 20; The Perseveraence, 2 Cir., 63 F.2d 788; The Syosset, 2 Cir., 71 F.2d 666; The Bellhaven, 2 Cir., 72 F.2d 206; Construction Aggregates Co. v. Long Island R. Co., 2 Cir., 105 F.2d 1009; Matton Oil Transfer Corp. v. The Greene, 2 Cir., 129 F. 2d 618. In the case at bar, the "Calatco" did observe the faulty position of the "Dauntless" in the channel long enough in advance to escape collision, and it is therefore true that, strictly speaking, the fault of being on the wrong side of the channel was a "condition," not a "cause," of the collision. But this does not exculpate the "Dauntless", which was nevertheless bound by the duties of a vessel meeting another head and head. When the "Calatco" blew—and particularly after she blew the second time—it was the "Dauntless's" duty to accept her proposal and to go to starboard. That duty was especially imperative because of the impossibility of the "Calatco" going very much to starboard. In flagrant disregard of this duty she concededly blew two blasts, seeking to force the "Calatco" off to port; navigation which her master sought to justify by the fantastic fabrication that the "Calatco" had been coming down from near Bergen Point Light.

▉ On the other hand the "Calatco" was not at fault. The "Dauntless" charges her with waiting too long before giving her signal, on the assumption she was slack in making out the "Dauntless." It is true that the witnesses for the "Calatco" are not in harmony as to where she was when she first blew. The judge made no finding, and perhaps the most reasonable estimate is that she first blew when somewhat east of Buoy 3A, about 1200 feet from the place of collision. The only testimony is that the mutual approach of the vessels was nine miles an hour; and if so, the signal must have been given nearly three minutes before collision (even if we disregard the slow bell of the "Calatco"). That was ample time for the "Dauntless" to go to starboard. The argument that the

"Calatco" had been keeping a faulty lookout, or that her tow was so made up as to shut off the "Dauntless," has very little to support it. Not only was the "Calatco's" vision to starboard wholly unobstructed, but she was headed a little across the "Dauntless'" projected course when she made her out, and indeed the "Dauntless" was probably a trifle nearer the shore. It would be the merest speculation to suppose that she did not see her in season.

The other fault charged against the "Calatco" is that Rule III of the Inspectors' Rules required her to blow a signal when the vessels were more than half a mile apart, which we will assume that she did not do. Whether Rule III is in conflict with the statute, we have never deliberately considered. In Henry Du Bois Sons Co. v. A/S Ivarans Rederi, 2 Cir., 116 F.2d 492, 493, 494, we did say that it had been several times "upheld", but the decisions we cited in support, except Judge Soper's in State of Maryland for Use of Dawson v. Standard Oil Company of New Jersey, 8 F.2d 514, did not consider the possible conflict of the rule with the statute. Nor did we consider it; and it does not appear that we need have done so. The meeting was not head and head or nearly, but starboard to starboard, and we are not certain that the vessels were not meeting "in such a manner as to involve risk of collision." If they were, the statute alone was enough to impose liability upon the "Ariosa." We regard it as still an open question whether, when vessels are not meeting within the definition of the statute but upon courses so as to pass at any distance up to half a mile away from each other, they must give passing signals. We need not decide it in the case at bar, because the "Dauntless" has quite misapprehended the meaning of the rule, assuming its validity. She appears to suppose that it requires vessels to give the signal when they are more than half a mile apart. It does not mean that; it merely imposes the duty of giving a passing signal whenever the vessels will pass within the distance of half a mile: i.e. when their projected courses are that distance apart. The phrase, "at a distance within half a mile of each other," is adjectival to the words "when passing or meeting"; not to the phrase "at all times." The Rule does not profess to lay down what is the minimum distance apart at which the vessels must signal; and indeed it would be most unreasonable so to construe it as to require signals always to be blown before the distance between the vessels is reduced to less than half a mile. In Henry Du Bois Sons Co. v. A/S Ivarans Rederi, supra, 116 F.2d 492, we clearly put our present interpretation upon it. While for the foregoing reasons we think the "Calatco" not at fault, the fault of the "Dauntless" was so glaring and inexcusable that, in accordance with well settled principles, we should not in any event have been disposed to inquire too curiously into the faults of the "Calatco."

Decree affirmed.