MATHIESON CHEMICAL CORP. v.
THE SADIE et al.

BLACK DIAMOND S. S. CORP. v.
THE SADIE et al.

THE STANCO ACID NO. 5.
THE UNION VICTORY.
Nos. 3065, 3079.

United States District Court
D. Maryland.
Dec. 19, 1950.

222

Hunt, Hill & Betts, of New York City (John W. Crandall and Robert M. Donohue, of New York City, Theodore R. Dankmeyer and Charles E. Quandt, of Baltimore, Md., of counsel), Niles, Barton, Morrow & Yost, of Baltimore, Md., for Black Diamond Steamship Corp. and United States of America.

Frank, Skeen & Oppenheimer, of Baltimore, Md. (John H. Skeen and John H. Skeen, Jr., of Baltimore, Md., of counsel), for Steamtug Sadie and Harbor Towing Corporation.

George W. P. Whip, of Baltimore, Md., for Mathieson Chemical Corporation, owner of Tank Barge Stanco Acid No. 5.

COLEMAN, Chief Judge.

This is a case of collision between a steamer and a tug and her tow, which occurred in the Chesapeake and Delaware Canal on July 14, 1948.

Shortly before dawn on that day, the Union Victory, a Victory ship 455 feet long, 62 feet beam, with a mean draft of 17 feet and 7606 gross tonnage, while under bareboat charter from the United States Maritime Commission to the Black Diamond Steamship Corporation, was proceeding eastbound through the Chesapeake and Delaware Canal. When in the vicinity of beacons 11 and 12, she collided with the steel tank barge Stanco Acid No. 5, whose length was 320 feet, beam 44 feet and depth 17 feet. This barge, now owned by the Mathieson Chemical Corporation, had no motive power and was westbound, light, through the Canal in tow of the tug Sadie, on the latter's starboard side and projecting about 140 feet beyond the latter's bow. This tug, owned by the Harbor Towing Corporation, was 69 feet long, 20 feet beam and 94 gross tons. The night was clear, with good visibility and little wind, with the current running to the eastward through the Canal at about one knot an hour, that is, in the direction that the Union Victory was proceeding. The Canal channel is about 250 feet wide with a depth at mean low water of about 28 feet and is marked at night by beacons, flashing red on the south side and white on the north side, varying in the distance apart from a half mile or less on or near curves to a mile or more on the straighter reaches.

The Black Diamond Steamship Corporation has sued the tug Sadie and her owner, the Harbor Towing Corporation; the Mathieson Chemical Corporation, owner of the barge Stanco Acid No. 5, has brought a separate suit against the Sadie and her owner, and the latter has impleaded the Black Diamond Steamship Corporation as charterer, and also the United States as owner of the Union Victory. The two suits have been consolidated.

On behalf of the Union Victory it is contended that the tug Sadie with her tow was solely at fault because, since the Union Victory was navigating with the current, she had the right of way and it was therefore incumbent upon the tug to keep out of her way. Also, while conceding that the Union Victory did not give a one blast signal as the vessels approached each other, but not conceding that such a signal from the tug was heard, it is claimed that since the two vessels were approaching port to port and not end on, the Union Victory was not obligated to give to the tug a passing signal.

On behalf of the tug, it is claimed that the Union Victory was solely at fault for not keeping to her own starboard side of the channel; also for failure to blow a passing signal, and more particularly, to respond to the one blast signal claimed to have been given by the tug, or, if her master was in doubt as to the latter's course or intention, by failing to blow a danger signal. Also, it is contended that the Union Victory was at fault for failure to reduce her speed.

The Bay pilot who was navigating the steamer testified by deposition that he first saw the tug when about a mile and a half away; that the tug was then showing her two vertical white lights and both

side lights were also visible. He said the steamer was making 5 or 6 knots with the tide; that a searchlight was being directed from the tug along the north bank of the channel, and that as the two vessels grew nearer to each other, the tug's green light disappeared, leaving only her red light and the white vertical lights visible. He said the steamer was overlapping the bow of the barge when the tug made a sudden sheer towards the steamer and the order was given the steamer to stop and for full speed astern, up to which time her speed had not been slackened; that she was well over on the right hand side of the channel; that at no time had he given any signal, and that he never heard any signal from the tug except the danger signal at the moment of collision when the steamer was going full speed astern. The pilot's license had been suspended twice during the last War. He had retired in 1949 after 48 years of piloting.

The master of the steamer, who was also on the bridge, testified by deposition that he first sighted the tug when about a mile away, and the steamer was making about 4½ knots. He stated that a searchlight was being thrown from the tug, directed to both sides; that at first, for a very brief time, only the starboard light of the tug was seen, with the two vertical white lights, but that almost immediately both side lights became visible; that the steamer was then brought 5° or 6° to starboard, which placed the two vessels red to red and they proceeded in this position until the tug and tow were almost abeam of the steamer's stem, when the tug suddenly made a left turn towards the steamer at a 45° or 50° angle, whereupon the steamer was immediately stopped and put full speed astern. He testified that the steamer never gave any signals, and that he never heard any except the tug's danger signal given at the time of collision. This witness had been navigating up and down the Canal for 21 years.

The steamer's second mate who was also on the bridge at the time testified by deposition that he repeated to the helmsman the orders given by the pilot and his testimony was substantially the same as that given by the master and the pilot. He said that if the tug had not swung across the channel the two vessels would have cleared each other by 75 or 100 feet. The deposition testimony of the bow lookout on the steamer coincides generally with that of the master and pilot. The only other person who testified on behalf of the steamer was her boatswain who was on her bow at the time, but was not standing a lookout and his deposition testimony is substantially the same as that of the master and pilot.

On behalf of the tug, her captain testified that when about a mile and a quarter from the steamer he saw only her green light; that when the vessels had gotten within about a half mile of each other, only the steamer's green light was still visible and that he blew one blast for a port to port passing, which was never answered by the steamer. He said he gave this signal because the steamer showed only her green light, although she had come around the bend at Sandy Point and had she straightened out on her own right hand side of the channel, both of her side lights should have been visible. He testified that, at the time he gave the one blast, he reduced the tug's speed from 5 miles to 2½ miles an hour and that she was then hugging her own side, that is, the north side of the channel, in fact so much so that she scraped beacon 11; that it was at this time that both side lights of the steamer first became visible to him; that when he scraped the beacon this shoved the tug and tow out a little into the channel; that he then went astern with the tug and again the barge struck the beacon, whereupon he testified that he gave the danger signal, seeing both of the steamer's side lights and that she was bearing down upon him. He said that when he reversed after scraping the buoy, it swung the tug and the barge to port. The testimony of the port watch on the tug varied little from her captain's testimony. Both he and the tug's assistant engineer testified that the tug's danger signal was preceded by her one blast.

On behalf of the barge, the two persons who were aboard her, her captain, who

was off duty and had been asleep until just before the vessels collided, and a barge hand testified. The testimony of both conformed generally to the testimony given on behalf of the tug, including the statement that the tug blew one blast prior to blowing the danger signal. There is no claim that the barge which was "dumb" (without motive power) was guilty of any fault as to lights or otherwise, independently of the tug Sadie that had her in tow.

The steamer unquestionably was the favored vessel since she was moving with the current. Regulation (h) of Sec. 207.100 of the Regulations promulgated by the Secretary of War for the navigation of the Chesapeake and Delaware Canal, provides as follows: "Right of Way—All vessels proceeding with the current shall have the right of way over those proceeding against the current. * * *." See Harbor Towing Corp. v. Parker, 4 Cir., 171 F.2d 416; The Mamei, 3 Cir., 152 F. 2d 924. Was the steamer, nevertheless, at fault in not giving, which is conceded, either (1) a passing signal, or (2) a danger signal?

It is true that Article 18 Rule I of the Inland Rules, 33 U.S.C.A. § 203, requires steam vessels to exchange the port to port passing signals, namely, one blast when they "are approaching each other head and head, that is, end on, or nearly so." The Rule states that "When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other. * * *

"The foregoing only applies to cases where vessels are meeting end on or nearly end on, in such a manner as to involve risk of collision; in other words, to cases in which, by day, each vessel sees the masts of the other in a line, or nearly in a line, with her own and by night to cases in which each vessel is in such a position as to see both the sidelights of the other.

"It does not apply by day to cases in which a vessel sees another ahead crossing her own course, or by night to cases where the red light of one vessel is opposed to the red light of the other, or where the green light of one vessel is opposed to the green light of the other, or where a red light without a green light or a green light without a red light, is seen ahead, or where both green and red lights are seen anywhere but ahead."

However, Supervising Inspector's Rule 312.3 (formerly Rule III) for Inland Waters commonly known as the Half Mile Rule provides that "The signals for passing, by the blowing of the whistle, shall be given and answered by pilots, in compliance with these Rules, not only when meeting 'head and head' or nearly so, but at all times, when the steam vessels are in sight of each other, when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port," and there is variance in the decisions dealing with the question as to whether or not this Half Mile Rule is to be interpreted as in conflict with Rule I of Article 18 and if so, which controls. In State of Maryland v. Standard Oil Co., D.C., 8 F.2d 514, the Half Mile Rule was held by Judge Soper, in this District, not to be inconsistent with the statutory rule but an additional rule promulgated in the interest of safety. In Southern Transportation Co. v. Dauntless Towing Line, 140 F.2d 215, a decision in 1944 by the Court of Appeals for the Second Circuit, that Court found it unnecessary to pass upon the Rule's validity, and merely held that assuming its validity, the Rule does not prescribe the distance at which signals must be given, namely, it does not profess to lay down what is the minimum distance apart at which the vessels must signal; that it would be unreasonable to construe it as requiring signals always to be blown before the distance between the vessels is reduced to less than half a mile, and that it merely imposes the duty of giving a passing signal whenever the vessels will pass within the distance of half

mile, that is, when their projected courses are that distance apart. To the same effect is Tucker v. The Sacony No. 9, 2 Cir., 167 F.2d 685, a later decision by the same court. Again the question of the Rule's validity was not adjudicated. See also Reading Co. v. Sabine Transportation Co., 3 Cir., 91 F.2d 112, a decision of the Court of Appeals, Third Circuit, in which the two Rules were held not to be inconsistent, but by a course of reasoning which we are unable to understand or follow. The Court there said 91 F.2d 112, at page 113: "Rule III, literally construed, would require the signal to be given at one-half a mile whether or not the vessels were in a position of danger with respect to one another or not. Rule IV [now Rule I] expressly requires a condition of 'risk of collision.' We do not believe, however, that rule III should be so construed as to be inconsistent with rule IV. We think that rule III applies and is intended to apply only where vessels are in a position of danger in respect to one another, and we so hold."

Sections 131 and 157 of Title 33 give to Supervising Inspector's Rules, when duly promulgated, the same force and effect as that of the statutory Rules, provided they are not inconsistent with the latter. We believe, however, it is not reasonable to construe this Half Mile Rule merely as a modification of Article 18, Rule I of the Inland Rules for "close up" situations, because the two Rules are by their express language, contrary to each other. Rule I of Article 18 is expressly limited to a situation where two vessels are approaching each other "end on, or nearly so", whereas the Half Mile Rule specifically says it is not limited to "meeting 'head and head' or nearly so." The two Rules thus being inconsistent with each other, the statutory Rule must prevail and the Half Mile Rule is invalid. It is strange that such inconsistency, so easily removed, and it being so important that it should be, affecting as it does such common yet often very hazardous situations, has been allowed to remain uncorrected for so many years. We are unwilling to adopt the conclusion reached in the Standard Oil Co. case, supra, by Judge Soper, in the absence of its affirmance by the Court of Appeals for this Circuit. In Griffin on Collision, Section 69, will be found a collection of cases on this question, which shows the great variance and confusion that has long existed in the numerous decisions. The situation clearly calls for clarification by further statutory Rule. Thus we conclude there was no Rule that required the Union Victory herself to initiate a one blast signal if we assume that, as is claimed on her behalf, such a signal was not initiated by the tug Sadie. If, as claimed by the Sadie, such a signal was given by her, the Union Victory was at fault in not responding with a one blast signal, or if those navigating her felt that the situation, as they then saw it, did not permit of a port to port passing, they should have stopped and reversed her engines, given the danger signal and not attempted to pass until everything seemed clear. Also, if the tug did later suddenly change her course and swing abruptly towards the Union Victory, the latter was obligated to sound the danger signal also when that occurred. These were the Union Victory's obligations apart from whether or not her failure to meet them contributed proximately to the collision, and if so, whether to a greater or less extent than fault on the part of the tug may have proximately contributed to it,—questions which we defer answering for the moment.

Turning now to the contention made on behalf of the tug Sadie, it is our conclusion that even if some parts of the testimony given on behalf of the tug be accepted as the more credible, including the testimony that she gave a one blast signal which it was conceded was never answered by a similar blast or by a danger signal, we believe that what caused the collision was the faulty navigation of the tug and her tow which caused the latter to strike beacon 11 on her own, that is, the north side of the Canal channel, which caused both the tug and barge to sheer out towards midstream of the channel. By the tug master's own admission, when he reversed his engines in an effort to resume his course closer to and more parallel to the

north bank of the channel, he rammed the buoy with the stern of his tow. These facts, added to the fact that the Union Victory was at this moment beyond the curve in the channel, and was proceeding approximately parallel with the southern edge of the channel, exposed both of the steamer's side lights to the tug. In other words, the danger of a head on collision which the master of the tug claims was apparent to him due to failure on the part of the steamer to straighten up after rounding the curve, was, we believe, not due to any such failure on the steamer's part but to the fact that the tug and her tow had gotten off of their proper course as a result of (1) the tow striking the buoy twice; (2) the tug with her tow being relatively unwieldy, that is, difficult to manoeuvre quickly, and (3) the tug and tow proceeding against the current which, in conjunction with the tow's striking the buoy, added to the difficulty of the tug manoeuvering with the tow. The very moment that this deflection from her proper course first began, the tug should have sounded the danger signal because this manner of navigation by the tug caused her and the barge to swing at an angle of about 45° towards the steamer, when almost abreast of the latter. The steamer thereupon put her engines full steam astern, but the two vessels came together with the result that the forward port side of the barge struck the steamer's port bow, causing extensive damage to it and also some damage to the barge. It is clear from the testimony that the point of collision was south of the center of the channel, that is, on the Union Victory's side of it.

The foregoing findings and conclusions have been reached only after a most minute and tedious examination of the very conflicting testimony, often clumsily and at times evasively given, by witnesses for both sides. The accurate appraisal of all the testimony has been rendered even more difficult by reason of the fact that the testimony given on behalf of the steamer by all of the important witnesses, namely, the steamer's master, the Chesapeake Bay pilot who was in charge of her navigation, and her second mate and boatswain who were also on the bridge, was entirely by deposition. The Court has been deprived of an opportunity to test their credibility by actually seeing and hearing them, which is so essential in a conflict such as exists here.

■ There remains to be considered (1) whether such fault as the Union Victory committed had any proximate relation to the accident, and (2) whether, even though this was the case, the fault on the part of the Sadie was so much greater as to call for the application of the major and minor fault rule, whereby only that vessel with the greater fault is to be held liable.

As to whether the fault of both vessels directly contributed to the collision, we conclude that this must be answered in the negative. If we accept it as a fact that the Sadie did signal for a port to port passing and that the Union Victory neither answered with the same signal nor blew a danger signal at any time, we find that these faults had no proximate relation to the collision. Certainly, the failure to answer the Sadie's one blast with a like signal did not. The same is true with respect to failure to answer the Sadie's one blast with a danger signal. No danger had yet become apparent. As for the Union Victory's failure to sound the danger signal immediately upon seeing that the Sadie and her tow had changed their course and were headed directly towards her, even had she done so, we cannot say that this would have been notice to the Sadie to do anything more than she did do, or could have done in the few seconds that intervened before the vessels came together. As we have already stated, the very moment that the Sadie and her tow were deflected from their proper course the first time the tow struck buoy no. 11, as a result of which the Sadie's engines were reversed, she should have sounded the danger signal because it was this deflection and the effort to overcome it, and not anything that the Union Victory had done, or omitted to do, that had placed the Sadie and her tow in a position of danger. Had the Sadie sounded the danger signal at that time, it would have been a warning to the

Union Victory to stop and reverse her engines, given when there was probably still time, by so doing, to have avoided the collision. Instead, the Sadie gave no danger signal until her master suddenly saw both the Union Victory's side lights, and that she was bearing down upon him. But even if we assume that a danger signal, if given earlier by the Sadie, would have been too late,—of no avail in avoiding the collision,—the Sadie must still be held to have been solely at fault by reason of her negligent navigation which caused her tow to strike buoy no. 11 not once but twice, and both tug and tow to cross into the Union Victory's proper side of the channel, thus violating the narrow channel Rule, which requires that "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." Inland Rules, Art. 25, 33 U.S.C.A. § 210. There is nothing to indicate that it was other than the Sadie's faulty navigation that caused the barge to strike the buoy, as a result of which both of these vessels came across the mid-channel into the Union Victory's right of way.

For the foregoing reasons, a decree will be signed, holding the tug Sadie solely responsible for the collision and the damage resulting therefrom to the barge Stanco Acid No. 5 and the steamer Union Victory.