The COMPANIA CARRETO DE NAVIGATION, S.A., as owner of the S/S PILOT, Libellant,

v.

The TUG SAGAMORE, her engines, etc., and James McWilliams Blue Line, Inc., and the STEEL BARGE MCS 701, and Merritt-Chapman & Scott Corporation, Respondents.

United States District Court
S. D. New York.
Nov. 6, 1963.

Haight, Gardner, Poor & Havens, New York City, for libellant; Robert M. Julian, Charles S. Haight, Jr., New York City, of counsel.

Macklin, Speer, Hanan & McKernan, New York City, for respondents; James M. Leonard, New York City, of counsel.

McLEAN, District Judge.

This is a suit in admiralty by the owner of the S. S. Pilot against the Tug Sagamore, the barge MCS 701, and their respective owners. The barge and its owner did not participate in the trial, the parties having stipulated that payment of 90 per cent of the barge's damages would abide the event of the trial of libellant's claim against the tug. The Sagamore and her owners did not file a cross libel.

The collision which gives rise to this suit occurred between the Pilot and the barge towed by the Sagamore at 12:45 A.M. on May 24, 1957. It was a fine clear night. The visibility was good. Both vessels were properly lighted and there was ample room for them to pass. The parties' explanations of this seeming-

ly inexplicable accident are in sharp conflict. In brief, libellant contends that the Pilot, southbound on a straight course, would readily have passed the northbound tug and its tow in a normal starboard to starboard passing, had it not been for the fact that the tug suddenly and unaccountably altered her course to starboard and crossed directly in front of the oncoming Pilot, with the result that, although the tug succeeded in clearing the Pilot's bow, the barge collided with the Pilot on the latter's starboard quarter. Respondent, on the other hand, asserts that the vessels would have passed port to port had it not been for the fact that shortly before the collision, the Pilot altered her course to port and headed directly for the tug, which tried to escape by changing her course to starboard, but was unable to tow her barge to safety before the impact occurred.

The issue thus presented is an issue of fact, depending essentially upon the credibility of the witnesses. Respondent has attempted to buttress the testimony of its witnesses by mathematical computations designed to prove that, shortly before the accident, the Pilot was not where libellant's witnesses said she was and that therefore she must have altered her course to port or the collision could not have occurred. The attempt is not convincing. Respondent's calculations are based entirely on estimates made by libellant's witnesses as to the direction and distance of the tug's lights, or of Point No Point Light, at a time over thirty minutes before the collision, when the vessels were still some miles apart. These estimates, derived merely from the naked eye observations of the witnesses, made at night over water without the aid of navigational instruments, are not precise enough to serve as the essential premise of trigonometric formulae. Moreover, even if the Pilot were, at some time before the collision, on a course different from that to which libellant's witnesses testified, it would not necessarily follow that she thereafter altered her course at a moment immediately prior to the accident. We have only the testimony of respondent's witnesses as to that.

Judged by the usual criteria of credibility, libellant's witnesses, to my mind, are more worthy of belief than respondent's. The Chesapeake Bay pilot in charge of the S.S. Pilot impressed me favorably by his demeanor on the stand and by the clarity and candor of his testimony. His testimony on the fundamental issue of which vessel altered its course is supported by the testimony, in person or by deposition, of the master, chief mate, helmsman and lookout of the vessel and by the contemporaneous entry in the Pilot's log. Respondent, on the other hand, called only two witnesses on this issue, the mate and deckhand of the tug. The captain of the tug did not testify, and his absence was rather lamely accounted for only by hearsay testimony to the effect that he had gone to Norway for a vacation. The mate's version of the accident was not supported by his own entry in the tug's log. It appeared for the first time in an accident report which he subsequently prepared after consultation with the captain. Respondent's version of the accident seems to me more inherently improbable than libellant's. Accordingly, on this fundamental issue of fact, I have accepted libellant's version. On this basis I find the facts to be as follows:

The S.S. Pilot was a Liberty ship of Panamanian registry with a Greek crew. She left Baltimore bound for Rotterdam about 4:30 P.M. on May 23, 1957, heavily loaded with a cargo of coal. On her passage down Chesapeake Bay she was in charge of Walter F. Jacobs, a duly licensed pilot. Her speed was about 9 to 9½ knots. Captain Jacobs' usual practice is to steer a course of 160 degrees true from 18A Buoy to Cove Point, where he usually alters course to 163 degrees true. On this occasion, however, in order to avoid traffic in the Cove Point area, he did not alter the vessel's course at the usual place, but continued to steer a course of 160 degrees true for about 30 minutes longer than usual. He then changed to a course of 163 degrees true.

As a result, after the change to a course of 163 degrees, the Pilot's track down the Bay was somewhat to the east of what it otherwise would have been. Although there was much discussion of this fact at the trial, it does not, in my opinion, affect the outcome of the case in any way.

Once the Pilot's course had been changed to 163 degrees true, her course was not altered again until the maneuvers subsequently to be related, which took place immediately prior to the collision. This is a fact of critical importance.

At approximately midnight, as the Pilot was approaching Point No Point Light, Captain Jacobs observed in the distance the lights of a vessel which ultimately turned out to be the Sagamore. These lights then bore approximately 3 degrees on the Pilot's starboard bow, i. e., almost dead ahead. He estimated that they were ten to twelve miles away.

Captain Jacobs continued to watch the lights and after a time he concluded that the vessel was a tug towing a barge and that she was approaching on a course reciprocal to the Pilot's. Captain Jacobs could see the tug's green side light which indicated that she was to the starboard of the Pilot. As he watched, the bearing of the light changed in relation to the bow of the Pilot. This showed that the tug was not dead ahead.

The Pilot passed Point No Point Light at a distance of one and one-half to two miles at 12:37 A.M. Some three minutes later, at approximately 12:40 A.M., the crisis arose. Both vessels up to that moment had held to their courses. The tug bore about 45 degrees on the Pilot's starboard bow. The estimates of libellant's witnesses vary somewhat as to how far away she was and what the distance would have been between the vessels at the moment of passing if they had proceeded without changing course. I find that at approximately 12:40 A.M. the tug was approximately one-quarter of a mile, i. e., 500 yards, from the Pilot. This was the distance on a diagonal line from one vessel to the other. Hence the

distance between the projected course of the tug and the ship at the moment of passing would have been somewhat less, i. e., from 350 to 400 yards. The vessels were sufficiently far apart so that they were not approaching each other end on or nearly so.

Up to that moment Captain Jacobs and the others on the bridge of the Pilot believed that the tug would pass to the starboard of the Pilot at a safe distance. They saw no danger of a collision. Neither vessel up to this time had blown any whistle signals.

At approximately 12:40 A.M., the tug suddenly altered her course to her starboard. Captain Jacobs and the others watching from the bridge of the Pilot were made aware of the tug's change of course by observing that the side lights of the Sagamore changed, first from green to green and red and then immediately to red only. The Sagamore blew one blast, thereby manifesting a desire for a port to port passing.

Immediately thereafter, at 12:42 A.M., the engines of the Pilot were reversed. She blew three blasts to indicate that this had been done. At the same moment the Pilot's wheel was put hard right.

The tug continued across the bow of the Pilot and as she did so, cast loose her towing hawser. It was obvious to those on the Pilot at that point that the barge and the Pilot would collide. In an attempt to lessen the force of the impact, the wheel of the Pilot at the last moment was put hard left. At 12:45 A.M. the barge struck the Pilot on her starboard side and slid down that side to the vessel's stern. The Pilot's engines were then stopped to avoid possible damage to the propeller. The ship's momentum, however, was sufficient to carry her forward approximately a half mile. She dropped anchor at 12:51 A.M.

The Sagamore had left Norfolk in the afternoon of May 23 bound for New York towing the barge laden with heavy construction equipment. At approximately midnight the mate came on watch. He took the wheel of the tug and was in charge of navigating her thereafter. The

only other man on deck was a deckhand. Although he saw the lights of the on-coming Pilot at some time, just when he could not recall, he at no time reported them to the mate. The mate first saw the Pilot's lights "around 12:30, maybe a little before." He offered no explanation as to why he had not seen them earlier. As I have stated, I reject the testimony of the mate and the deckhand to the effect that the Pilot was to the port of the tug, and that she suddenly altered course and bore down on the tug. It is thus unnecessary to discuss that testimony further.

■ Upon the facts as found, I conclude that the Sagamore was at fault and that her fault was a contributing cause of the accident and of the damage to the Pilot. The fault consisted of her unwarranted change of course which converted what would otherwise have been a safe starboard to starboard passing into a collision. New York, New Haven and Hartford R. Co. v. Baltimore & Ohio R. R., 236 F.2d 228 (2d Cir. 1956).

This is so obvious a basis of liability that it is unnecessary to decide whether the Sagamore was also at fault for failing to keep a proper lookout, or whether the deckhand's failure to report the lights of the oncoming Pilot was immaterial, since the mate was aware of them in ample time to avoid a collision.

■ This would dispose of the case were it not for the fact that respondent claims that the Pilot was also at fault in failing to give whistle signals allegedly required by the statutory Inland Rules and by the Pilot Rules. Libellant complains that no such claim was made in the pleadings or at pretrial. The facts developed at the trial, however, do raise the issue and it must be considered.

■ There is no doubt that the only whistle signal blown by the Pilot at any time was the three blast signal which she gave upon reversing her engines at approximately 12:42, some three minutes before the collision. Respondent suggests that the Pilot was at fault for failing to blow a four blast danger signal which the Inland Rules require when one

vessel fails to understand the course or intention of the other (33 U.S.C. § 203 Rule III). It has been held, however, that the three blast reversing signal is sufficient. Tucker v. The Socony No. 9, 167 F.2d 685 (2d Cir. 1948)

At the time that the Pilot blew this signal the vessels were in extremis, each was aware of the other, and the blowing of a further danger signal would have served no purpose. The failure to blow it, therefore, was not a contributing cause of the collision.

■ Respondent further contends that the Pilot violated Rule I of Article 18 of the Inland Rules (33 U.S.C. § 203) because she failed to signal for a starboard to starboard passing at some time prior to the moment when the crisis developed. In my opinion this rule does not apply here. The rule provides that it is applicable only "to cases where vessels are meeting end on or nearly end on, in such a manner as to involve risk of collision; in other words, to cases in which * * * each vessel is in such a position as to see both the side lights of the other. It does not apply * * * to cases * * * where the green light of one vessel is opposed to the green light of the other, or where * * * a green light without a red light, is seen ahead." Since these vessels were not meeting end on or nearly so, and since the Pilot could see only the green light of the Sagamore at all times until the Sagamore changed course, the Pilot up to that time was not required by this rule to signal for a starboard to starboard passing. Once the course change occurred and the crisis arose, no such signal would have been useful or appropriate, for at that point it was no longer a question of whether the vessels would pass port to port or starboard to starboard, but solely a question of whether they could avoid a collision.

■ Respondent's final contention is based upon the so-called "half mile rule," formerly Pilot Rule III (33 C.F.R. § 80.-3). This rule and the others which accompany it are promulgated by the Coast Guard in accordance with authority conferred by statute (33 U.S.C. § 157). These rules, if valid, have the force of

law. They are valid unless they are inconsistent with the statutory rules. See Griffin on Collision, 1949 § 13.

█ These rules provide that "one short blast of the whistle signifies intention to direct course to own starboard," (*i. e.*, a preference for a port to port passing), and "two short blasts of the whistle signify intention to direct course to own port," (*i. e.*, a preference for a starboard to starboard passing) (33 C.F.R. § 80.03). The Rules then state (33 C.F.R. § 80.3):

> "(a) The signals for passing, by the blowing of the whistle, shall be given and answered by pilots, in compliance with the rules in this part, not only when meeting 'head and head', or nearly so, but at all times when the steam vessels are in sight of each other, when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port."

The rule means that the signals must be given whenever the projected courses of the vessels are less than half a mile apart. Southern Transportation Co. v. Dauntless Towing Line, 140 F.2d 215 (2d Cir. 1944).

This was the case here, not only at the moment when the Sagamore altered her course, but also for some minutes before. The Pilot did not give the two blast signal. It follows that if the rule is valid and is to be literally construed, the Pilot was at fault for failure to comply with it.

█ Libellant urges that in any event the fault was not a contributing cause of the accident. I do not agree. Assuming the validity of the rule, the doctrine of The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873), is applicable, and the burden is on libellant to show that the violation could not have contributed to the accident. This is a severe burden which has not been met here. The cases cited by libellant are

of no real assistance, for on a question such as this, each case depends upon its particular facts. Since I have found that the Sagamore was in fact to the starboard of the Pilot as the vessels drew near one another, and not to her port, as respondent's witnesses claimed, the evidence does not afford any certain explanation of why the Sagamore suddenly altered her course to starboard. The most reasonable hypothesis is that the Sagamore's mate was inattentive or preoccupied with his other duties until he suddenly noticed at 12:40 A.M. that the Pilot was near at hand. We may suppose that instinct then prompted him to attempt to pass port to port, as would have been his duty if the vessels had in fact been approaching head and head, and that he failed to observe the Pilot's position accurately enough to realize that the vessels were not end on or nearly so, and that a change of course on his part to starboard was indeed the worst move that he could make. Something of the sort must have occurred, for otherwise the mate's unfortunate decision is wholly inexplicable. Under these circumstances, if the Pilot shortly before 12:40, when she was less than a half mile from the Sagamore, had signaled for a starboard to starboard passing, it might well have clarified the situation for the Sagamore's mate and brought him to his senses, so to speak, so that he would have adhered to his original course and thus passed the Pilot safely on her starboard. Perhaps a signal from the Pilot would not have had that effect, but it cannot be said with certainty that it could not have had it.

█ We thus have squarely presented in this case a question which the Court of Appeals has said to be an open one in this Circuit, *i. e.*, whether "when vessels are not meeting within the definition of the statute, but upon courses so as to pass at any distance up to half a mile away from each other, they must give passing signals." Southern Transportation Co. v. Dauntless Towing Line, 140 F.2d 215 at 217 (2d Cir. 1944) [1]

---

1. The statute to which the court referred is the statutory Inland Rule I which, as

I have pointed out, applies only to the "end on or nearly so" situation.

This question has been approached by courts in other circuits in two different ways. In The Gwynedd, 91 F.2d 112 (3rd Cir. 1937), the court construed the rule as intended to apply "only where vessels are in a position of danger in respect to one another." Since in that case they were not in such a position, the court held that libellant's vessel, the Ajax, was not obligated to sound the passing signal even though its projected course was within half a mile of respondent's vessel, which ultimately, as in the case at bar, took a sudden sheer across the course of the Ajax.

In Mathieson Chemical Corp. v. The Sadie, 95 F.Supp. 221 (D.Md. 1950), Judge Coleman indicated his disagreement with the decision in The Gwynedd as far as the construction of the half mile is concerned. He construed the rule to require passing signals even though the vessels were not meeting end on or nearly so. As thus construed, he found the rule to be inconsistent with the statutory Rule I and hence invalid. Therefore, non-compliance with the rule did not constitute a fault. In reaching this conclusion, he expressly declined to follow an earlier decision in the same district, State of Maryland v. Standard Oil Co., 8 F.2d 514 (D.Md.1925), which had upheld the validity of the half mile rule.

On the other hand, in The Papoose, 1934 Am.Mar.Cas. 993 (S.D.N.Y.1934), Judge Caffey, having construed the rule in fashion similar to Judge Coleman, decided that it was not inconsistent with the statutory rule and hence that it was valid. He found the vessel at fault solely by reason of her failure to give the passing signals which the rule requires.[2]

As I read these decisions, they present three alternatives:

1. The Pilot Rule does not purport to require signals unless vessels are end on or nearly so, in such a manner as to involve risk of collision. This I take to be what the court in The Gwynedd meant by "a position of danger."

2. The rule does purport to require signals whenever the projected course of the vessels will bring them within one-half mile of each other, regardless of whether they are end on or nearly so. As thus construed, the rule is inconsistent with the statutory rule.

3. The rule as construed in (2) is not inconsistent with the statutory rule.

The third alternative, i. e., Judge Caffey's view, seems to me to be the correct one. As far as the construction of the rule is concerned, to say that it purports to apply only in the end on situation is to say that it is a mere unnecessary duplication of the statutory rule. Moreover, such a construction flies in the face of the express language of the Pilot Rule, which states that it applies "not only when meeting 'head and head,' or nearly so, but at all times, etc."

As far as the alleged inconsistency is concerned, I see none, because it seems plain that the Pilot Rule was intended to operate in an area which the statutory rule did not attempt to cover. It does not contradict the statutory rule, but merely supplements it.

Whether the rule is wise or not is a question for the rule making authority, not for the court. Whether or not pilots, as a matter of practice, disregard it when they see no risk of collision is beside the point. It may be observed, however, that a collision actually occurred in this case, even though the projected tracks of the vessels were nearly a quarter of a mile apart and even though there was no "risk of collision" as that phrase is defined by the statutory rule.

Captain Jacobs admitted that he was aware of the Pilot Rule and that he had not complied with it. Doubtless he would have said, if he had been asked, that he gave no signal because he saw no danger.

2. The Court of Appeals placed its affirmance of Judge Caffey's decision on a different ground and did not pass upon this question. The W. L. Steed (The Papoose), 79 F.2d 2 (2d Cir. 1935), cert. denied, John E. Moor Co. v. Pan Am. Petroleum & Transport Co., 297 U.S. 708, 56 S.Ct. 500, 80 L.Ed. 995 (1936).

Nevertheless a collision did occur, and a signal might have averted it.

I conclude, therefore, that the Pilot was also at fault in failing to sound a signal for a starboard to starboard passing shortly before 12:40 A.M. when the Sagamore undertook its disastrous maneuver. I conclude that this fault was a contributory cause of the accident. It follows that the libellant may recover only one-half its provable damages and that, pursuant to the stipulation, it is liable for one-half the damages sustained by the barge.

Pursuant to Admiralty Rule 46½, this opinion constitutes the court's findings of fact and conclusions of law.

Submit decree in accordance with this opinion.